**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**May 19, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

CONCEPCION MARIE LEDESMA,

      Defendant-Appellant.

No. 05-3163

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D.C. No. 03-40100-01-SAC)**

---

James A. Brown, Assistant United States Attorney (Eric F. Melgren, United States Attorney, with him on the briefs), Topeka, Kansas, for Plaintiff-Appellee.

Michael S. Holland, Holland and Holland, Russell, Kansas, for Defendant-Appellant.

---

Before **McCONNELL, BALDOCK**, and **TYMKOVICH**, Circuit Judges.

---

**McCONNELL**, Circuit Judge.

---

This is the latest in a series of cases confronting this Court concerning traffic stops based on problems with temporary registration tags. We hold that displaying a temporary tag behind a heavily tinted rear window violates a Kansas statute requiring that licence plates appear "in a place and position to be clearly visible." *See* Kan. Stat. Ann. § 8-133. State troopers therefore did not exceed the permissible scope of their traffic stop by issuing a citation and requesting consent for a subsequent search. We affirm the decision of the district court.

## I. Factual Background

On the afternoon of May 20, 2003, Kansas State Trooper Jerett Ranieri noticed a group of three vehicles traveling close together in the slow lane on I-70. One of the vehicles had Michigan plates. Another, a black Chevy van, had no visible licence plate or registration. Trooper Ranieri "didn't see anything at all" resembling a licence plate on the van, either "on the back of the vehicle or on the bumper of the vehicle." Appellee's Supp. App. 25. Aware that Kansas law requires licence plates to appear "in a place and position to be clearly visible," Kan. Stat. Ann. § 8-133, Trooper Ranieri conducted a traffic stop. As he approached the car on foot, he could "kind of see something" that "resembled registration" in the rear window. Appellee's Supp. App. 27, 52. Even at a distance of four or five feet, however, the "[e]xtremely dark" tinting of the rear window made the temporary tag "hard to read." *Id.* at 26. He could not tell, for

example, what state issued the registration tag, or whether the barely-legible numbers were expiration numbers.

The driver of the car was Defendant-Appellant Maria Concepcion-Ledesma, and her passenger was Lena Beydoun. Trooper Ranieri asked Ms. Concepcion-Ledesma for her license, registration, and insurance information, and informed her that the vehicle's tag was "unreadable, not visible." *Id.* at 28. Trooper Ranieri then asked the women about their travel plans. They replied that they were driving from Detroit to Los Angeles for a vacation of one or two weeks. When Trooper Ranieri asked where they planned to stay in Los Angeles, they said they did not know, and that they "maybe could find some friends down there." *Id.* at 31. Yet Trooper Ranieri saw no luggage in the van, suggesting that the women were not actually vacationing. They denied traveling together with the two other vehicles Trooper Ranieri had seen nearby in the slow lane. He found the denial suspicious because he had observed the three vehicles traveling close together, and because at least one of the other vehicles had Michigan plates, both women had Michigan driver's licenses, and they indicated that they were traveling from Detroit. Trooper Ranieri found a number of other factors suspicious as well: (1) he smelled the odor of air freshener, which "could be used to conceal the odor of illegal drugs," *id.* at 34; (2) he could tell that the van was recently purchased, and he "thought that [it] was a little funny they were already taking a trip with it," *id.* at 39; (3) the women carried a cell phone and an atlas

and (4) the women were "coming from an area where narcotics is [sic] usually warehoused or narcotics is [sic] stored . . . to another source city," *id.* Throughout the conversation, both women appeared "extremely nervous" to Trooper Ranieri. *Id.* at 30. Ms. Beydoun never made eye contact, and Ms. Concepcion-Ledesma's hands and voice were "real shaky." *Id.* at 29–30. Trooper Ranieri found this behavior suspicious "[b]ecause normal people will talk, and they're friendly with law enforcement officers, you know, because we're here to help." *Id.* at 29. He later conceded that many motorists who are innocent, or who merely receive a speeding ticket, are nervous when stopped by state troopers, but testified that the kind of nervousness he observed in this case was "the same type of nervousness that I see [in] people running loads of drugs or hiding something." *Id.* at 80.

Trooper Ranieri took the paperwork back to his vehicle, filled out a warning for displaying a registration tag that was not clearly visible, and returned to the side of the van. Although his testimony at the suppression hearing differed from Ms. Concepcion-Ledesma's, the district court found, based on a videotape of the stop, that Trooper Ranieri returned the women's documents. This exchange followed:

> Trooper Ranieri: This is just a warning paper saying like if you get stopped again you can show them that you have been warned and if you get stopped again [inaudible].
>
> Female voices: Okay.

Trooper Ranieri:   Thank you girls.  You have a safe one.  Ma'am you
                   wouldn't have anything, uh, weapons, or any type of
                   illegal stuff in the back?

Female voices:     No.

Trooper Ranieri:   Could we look, could we take a minute to look back
                   there?  Just your bag and stuff.

Female voices:     Yeah.

Trooper Ranieri:   Just for my safety could I have you two hop out, just for
                   my safety, just take five minutes—get you moving down
                   the road.  We have a lot of stuff moving back and forth.
                   Thank you.

Videotape; Mem. & Order 5.  Trooper Ranieri understood the women's consent to

a search of their "bag and stuff" as consent to search the entire van.

Accompanied by Trooper Andrew Dean, who had recently arrived at the

scene, Trooper Ranieri opened the back doors of the van.  They confirmed that

the only pieces of luggage the women carried were two small duffel bags.  Upon

opening the back doors of the van, they could also see suspicious signs of

alterations to the interior of the vehicle.  Specifically, Trooper Ranieri testified

that:

> [I]t looked like the van had been— the side walls and panels and stuff had
> been taken off and put back on several times, or just taken out and put back
> in a little jagged, because insulation— and screws and stuff were all scarred
> and marked up, the panels were all kind of, like they were pulled out, and
> you could see where the carpet and panel didn't match up, because it
> looked like they had been pulled away from the wall and were offset.

*Id.* at 44–45. Upon seeing this evidence of tampering with the interior of the vehicle, Trooper Ranieri's suspicion "skyrocketed." *Id.* at 45. Trooper Dean removed a foam insert from the inside of a manufactured cup holder, revealing a layer of foam. By removing the foam, he discovered vacuum sealed packages containing small tablets. Further exploration turned up tablets throughout the interior of the van. Field testing revealed that the packages contained approximately 330 pounds of pseudoephedrine, a list I chemical. *See* 21 U.S.C. § 802(34)(K).

Later, the troopers learned that the van in fact displayed an ordinary, valid temporary registration issued by the State of Michigan. Although no Michigan statute specifies the proper location for display of a temporary registration, the registration sticker itself contains printed instructions: "Moisten face of sticker and place on inside of lower left rear window." *Id.* at 55. According to Trooper Ranieri, the display of the temporary registration on the van comported with those instructions. They also learned that the van in fact contained no air freshener. On cross-examination, Trooper Ranieri admitted that he was not sure it was air freshener, but that it was "just like a smell that you'd smell, kind of a fruity sweet smell." *Id.* at 57. He also acknowledged that the smell could have been placed in the van by the dealership, as the van had been purchased only a few days earlier.

Ms. Concepcion-Ledesma was indicted on three counts: (1) possession of 332 pounds of pseudoephedrine, knowing or having reasonable cause to believe it

would be used to manufacture methamphetamine, *see* 21 U.S.C. § 841(c)(2); (2) conspiracy to possess 530 pounds of pseudoephedrine, knowing or having reasonable cause to believe it would be used to manufacture methamphetamine, a Schedule II controlled substance, *see id.* §§ 841(c)(2), 846; and (3) traveling in interstate commerce to promote and carry on the unlawful activity of methamphetamine manufacture, *see id.* § 1952(a)(3)(B). The district court denied her motion to suppress the pseudoephedrine recovered from her vehicle, but ultimately dismissed the other two counts against her. She entered a conditional guilty plea as to the last count, reserving the right to bring this appeal concerning the legality of the traffic stop and ensuing search.

## II. Discussion

Ms. Concepcion-Ledesma appeals from the district court's order denying her motion to suppress. She challenges three aspects of the traffic stop and search. First, she argues that Trooper Ranieri exceeded the permissible scope and duration of the stop under *United States v. McSwain*, 29 F.3d 558 (10th Cir. 1994). Second, she argues that she did not voluntarily consent to any search of her vehicle. Third, in the alternative, she argues that at most she consented to a limited search of her "bag and stuff," and that Troopers Ranieri and Dean exceeded the scope of that consent by prying open interior panels of the van to discover the pseudoephedrine. The government concedes that she did not consent

to a search behind the panels of the van, but argues that the officers had probable cause to expand the search.

**A.  Scope and Duration of the Traffic Stop**

A traffic stop is a seizure for Fourth Amendment purposes, and must be justified by reasonable articulable suspicion under the standards set forth in *Terry v. Ohio*, 392 U.S. 1 (1968).  *United States v. Hunnicutt*, 135 F.3d 1345, 1348 (10th Cir. 1998).  Under our case law, a traffic stop is reasonable if (1) "'the officer's action was justified at its inception,'" and (2) the officer's action "'was reasonably related in scope to the circumstances which justified the interference in the first place.'"  *United States v. Botero-Ospina*, 71 F.3d 783, 786 (10th Cir. 1995) (en banc) (quoting *Terry*, 392 U.S. at 20).  In this case, Ms. Concepcion-Ledesma concedes that Trooper Ranieri's actions were justified at their inception. He could not see any licence plate or temporary registration anywhere on the rear of the vehicle, an apparent violation of Kansas law.  *See* Kan. Stat. Ann. § 8-133; *see also Botero-Ospina*, 71 F.3d at 787 (holding that "a traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring").  She argues instead that the traffic stop exceeded the permissible scope of the detention in light of its underlying justification.

In *United States v. McSwain*, 29 F.3d 558, 561 (10th Cir. 1994), a Utah state trooper stopped the defendant's vehicle "for the sole purpose of ensuring the validity of the vehicle's temporary registration sticker." While driving, the trooper found the registration tag difficult to read because the expiration date appeared to be covered with reflective tape. *Id.* at 560. As he approached the vehicle on foot, he verified that the registration tag was valid and not expired, and he observed no violation of state law. *See id.* We held that the trooper's decision to prolong the detention by requesting license and registration information and questioning the driver "exceeded the scope of the stop's underlying justification" and therefore violated the Fourth Amendment. *Id.* at 561.

By contrast, in *United States v. DeGasso*, 369 F.3d 1139 (10th Cir. 2004), a state trooper observed a continuing violation of state law after stopping a vehicle, and we upheld the ensuing detention. In *DeGasso*, an Oklahoma trooper pulled over a truck after observing that its rear license plate was mounted too low, obscuring the lettering at the bottom of the registration tag. *Id.* at 1141. An Oklahoma statute required all licence plates to be "clearly visible at all times," 47 Okla. Stat. § 1113.A.2, and this Court predicted that Oklahoma courts would construe that requirement to apply equally to out-of-state drivers, *see DeGasso*, 369 F.3d at 1147 (noting "the common-sense proposition that police officers have no less need to identify out-of-state vehicles than they have to identify those in Oklahoma"). As a result, the case was "easily distinguishable" from *McSwain*:

In *McSwain*, the traffic stop was made in order to determine whether a temporary registration sticker was valid; there was no requirement that it be visible or unobscured. In that case, when the officer approached the vehicle and found that the sticker was valid, the purpose for the stop was over. In this case, the violation was that the lettering on the license plate was not 'clearly visible,' which remained true even after the trooper approached the truck and was able, at that point, to read it.

*Id.* at 1149.

Recently we decided the constitutionality of a traffic stop based on the same Kansas statute at issue in this case. *See United States v. Edgerton*, 438 F.3d 1043, 1045 (10th Cir. 2006). Kansas law requires that "[e]very license plate shall at all times be securely fastened to the vehicle . . . in a place and position to be clearly visible, and shall be maintained free from foreign materials and in a condition to be clearly legible." Kan. Stat. Ann. § 8-133. In *Edgerton*, Trooper Dean (coincidentally, the same officer who assisted Trooper Ranieri in this case) spotted a vehicle from Colorado on an interstate highway at 2:30 a.m. 438 F.3d at 1045. He could not read the vehicle's temporary registration tag, which was posted in the rear window as required by Colorado law, not because of any obstruction but solely because "it was dark out." *Id.* After stopping the vehicle and approaching on foot, Trooper Dean had no difficulty reading the tag and noted that it appeared valid. *Id.* Nevertheless, Trooper Dean inspected the undercarriage of the vehicle, issued a warning for a violation of § 8-133, questioned the driver, and eventually requested and received consent to search the

trunk. *Id.* at 1045–46. We held that these actions exceeded the permissible scope of the detention in light of its underlying justification. *Id.* at 1051. The decision in *Edgerton* rested on the conclusion that § 8-133 does not criminalize a "wholly unremarkable" temporary registration simply because a vehicle is traveling at night. *See id.*

Turning to the facts in this case, the van driven by Ms. Concepcion-Ledesma had "[e]xtremely dark" window tinting—so dark, in fact, that Trooper Ranieri could hardly make out the numbers on the temporary registration, even as he approached on foot from a distance of four or five feet. Appellee's Supp. App. 26–27. Specifically, he could not read the name of the state that issued the tag, and he could not determine whether the numbers represented an expiration date. Trooper Ranieri thus observed a straightforward violation of § 8-133: rather than displaying her temporary tag "in a place and position to be clearly visible," Ms. Concepcion-Ledesma displayed it behind a plate of tinted glass that rendered it almost entirely illegible.

That she appears to have complied with Michigan law by following the printed instructions on the sticker does not render the detention unreasonable, both because state troopers cannot be expected to possess encyclopedic knowledge of the traffic regulations of other states, and because Kansas courts have held that "the display of an illegible or obscured vehicle tag is a violation of

K.S.A. 8-133 even if the vehicle is duly licensed in another state." *State v. Hayes*, 660 P.2d 1387, 1389 (Kan. Ct. App. 1983).

Accordingly, the extended detention of Ms. Concepcion-Ledesma did not violate the Fourth Amendment. Trooper Ranieri saw that Ms. Concepcion-Ledesma's registration tag was displayed in an unlawful manner "even after [he] approached the [vehicle] and was able, at that point, to read it." *See DeGasso*, 369 F.3d at 1149. It was therefore reasonable under the circumstances for Trooper Ranieri to issue a written warning, verify Ms. Concepcion-Ledesma's license and registration information, and ask preliminary questions about travel plans. *Hunnicutt*, 135 F.3d at 1349; *United States v. Hernandez*, 93 F.3d 1493, 1499 (10th Cir. 1996).

## B. Consent to a Limited Search

Next Ms. Concepcion-Ledesma argues that the search of her vehicle was not consensual. The district court held that she consented to a limited search of her "bag and stuff," but not to a general search of the entire van. She argues that she did not voluntarily consent to any search. We review the district court's factual findings for clear error, and its legal conclusion as to the reasonableness of the search *de novo*. *United States v. McKissick*, 204 F.3d 1282, 1296 (10th Cir. 2000).

Without reasonable suspicion, a warrantless search of luggage or a vehicle is unreasonable, notwithstanding verbal consent by the owner, if the "consent to

the suspicionless search was involuntary." *United States v. Drayton*, 536 U.S. 194, 206 (2002). The Supreme Court has held that officers need not expressly inform suspects that they are free to go before requesting permission to conduct a search. *Ohio v. Robinette*, 519 U.S. 33, 39–40 (1996). Instead, "[v]oluntariness is a question of fact to be determined from all the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 248–49 (1973). The central question is whether "a reasonable person would believe he was free to leave or disregard the officer's request." *United States v. Manjarrez*, 348 F.3d 881, 885–86 (10th Cir. 2003).

In our traffic stop cases, we have identified a number of factors that suggest that an encounter was not consensual, including the "threatening presence of several officers," the "use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory," the "prolonged retention of a person's personal effects such as identification," the "absence of other members of the public," and the officer's failure to advise the defendant that she is free to leave. *United States v. Hill*, 199 F.3d 1143, 1147–48 (10th Cir. 1999); *see also United States v. Broomfield*, 201 F.3d 1270, 1274 (10th Cir. 2000). Conversely, we have pointed to other factors as evidence that an encounter was consensual, including an officer's "pleasant" manner and a tone of voice that is not "insisting," *McSwain*, 29 F.3d at 563, a public location such as "the shoulder of an interstate highway, in public view," *United States v. Soto*, 988 F.2d 1548, 1558 (10th Cir. 1993), and the prompt return of the defendant's identification and

papers, *United States v. Zapata*, 997 F.2d 751, 757 (10th Cir. 1993). None of these factors is dispositive, however, as "a court must consider all the circumstances surrounding the encounter" to determine whether consent was voluntary. *Florida v. Bostick*, 501 U.S. 429, 439 (1991); *see also Hill*, 199 F.3d at 1148.

In this case, after filling out a written warning for the temporary tag violation, Trooper Ranieri returned to the van and returned Ms. Concepcion-Ledesma's license and registration. After explaining the warning, he added in an ordinary, nonthreatening voice, "Thank you girls. You have a safe one." Mem. & Order 5. At that point, a reasonable person would have felt free to leave. Phrases like "thank you" and "have a safe one" signal the end of an encounter, and afford a defendant an opportunity to depart. Although he did not explicitly inform Ms. Concepcion and her passenger that they were free to leave, Trooper Ranieri's words of farewell suggested that any subsequent discussion was consensual.

Following that exchange, Trooper Ranieri asked whether Ms. Concepcion-Ledesma and her passenger had "anything, uh, weapons or any type of illegal stuff in the back." *Id.* When they replied that they did not, he asked, "Could we look, could we take a minute to look back there? Just your bag and stuff." *Id.* The request was phrased as a question and spoken in an ordinary tone of voice. The women replied, "Yeah." *Id.* Nothing about this line of

- 14 -

questioning—conducted in public view on an interstate highway—suggests coercion or intimidation. *See United States v. Elliott*, 107 F.3d 810, 814 (10th Cir. 1997) (holding that traffic stop became consensual once the officer returned the driver's documentation, noting that "there is no indication his questioning was accompanied by any coercive show of authority"). Accordingly, their consent to a limited search of "your bag and stuff" was voluntary.

Ms. Concepcion-Ledesma points out that a second officer, Trooper Dean, was present at the scene, and reminds us that the presence of multiple officers may cut against the conclusion that consent was voluntary. Yet Trooper Dean arrived only *after* Ms. Concepcion-Ledesma consented to a limited search of the back of her vehicle. Appellee's Supp. App. 91 ("Q. Were you present when [Trooper Ranieri] asked for consent? A. No."). She also characterizes Trooper Ranieri's language as "aggressive." Aplt. Br. 24. The videotape reveals not a hint of aggression during the exchange concerning the search, however, and she appears to concede that Trooper Ranieri only raised his voice later in the encounter, after expanding the search to include the hidden compartment. Neither of these factors could have rendered Ms. Concepcion-Ledesma's consent involuntary because they took place after she gave permission for the search. At the time she consented, Trooper Ranieri was alone and his tone of voice was ordinary, even amiable.

At bottom, Ms. Concepcion-Ledesma's complaint is that Trooper Ranieri never explicitly told her she was free to leave. The Supreme Court has admonished, however, that an officer's failure to inform the defendant that she is free to leave, standing alone, does not make an encounter nonconsensual. *Drayton*, 536 U.S. at 206. Under the circumstances, we have no difficulty concluding that Ms. Concepcion-Ledesma voluntarily consented to a search of her "bag and stuff" in the rear of the van.

## C. Probable Cause to Search the Hidden Compartment

In the proceedings below, Trooper Ranieri testified that he understood Ms. Concepcion-Ledesma to have consented to an unrestricted search of the entire van. The phrase "your bag and stuff," he explained, meant anything and everything the police might find, even if it meant prying open panels and removing foam inserts from the walls of the van. The government has (wisely) abandoned this position on appeal, and now concedes that Ms. Concepcion-Ledesma only consented to a limited search that "did not extend to the areas behind the panels." Br. of Appellee 16. Nonetheless, the government maintains that the search was proper because, in the course of performing the consensual search "in the back," the troopers discovered evidence of a secret compartment that provided probable cause for a more extensive search.

The district court held that the presence of screws and ill-fitting panels in the back of the van, which indicated the presence of a hidden compartment,

together with the defendants' extreme nervousness, the suspicious nature of their travel plans, the absence of luggage sufficient for their stated purpose, and the newness of the vehicle, constituted probable cause to search the van. Mem. & Order 19. On appeal, this Court must accept the factual findings of the district court unless they are clearly erroneous, and must view the evidence in the light most favorable to the determination of the district court. *United States v. Williams*, 271 F.3d 1262, 1266 (10th Cir. 2001). In this case, the basic facts are not disputed.

As to the ultimate legal conclusion regarding whether, in light of those facts, the officers had probable cause to search, we must apply a *de novo* standard of appellate review. *Ornelas v. United States*, 517 U.S. 690, 699 (1996). In conducting this *de novo* review, we must "look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *United States v. Cortez*, 449 U.S. 411, 417–18 (1981)). As the phrase suggests, a "totality of the circumstances" test does not depend on whether any particular factor is innocent when considered in isolation, but on whether, taken as a whole, the facts observed by the law enforcement officers indicate a fair probability that the vehicle contains contraband or evidence. *United States v. Nielsen*, 9 F.3d 1487, 1489–90 (10th Cir. 1993).

When conducting a "totality of the circumstances" analysis of reasonable suspicion or probable cause, this Court typically examines each factor invoked by law enforcement and credited by the district court, "look[ing] not only to the facts supporting probable cause, but also to those that militate against it." *United States v. Valenzuela*, 365 F.3d 892, 897 (10th Cir. 2004); *see, e.g.*, *United States v. Johnson*, 364 F.3d 1185, 1190–94 (10th Cir. 2004); *United States v. Santos*, 403 F.3d 1120, 1126-34 (10th Cir. 2005). Even where a particular factor, considered in isolation, is of "limited significance" and must be "discount[ed]," it nonetheless may affect the Fourth Amendment analysis when combined with other indicia of probable cause or reasonable suspicion. *Johnson*, 364 F.3d at 1192; *see also Santos*, 403 F.3d at 1133–34. "[N]o single factor is determinative, and we view the circumstances in their totality rather than individually." *Valenzuela*, 365 F.3d at 897. By examining and evaluating the various factors, an appellate court can advance the purposes served by *de novo* review. As the Supreme Court has explained, "*de novo* review tends to unify precedent and will come closer to providing law enforcement officers with a defined 'set of rules which, in most instances, makes it possible to reach a correct determination beforehand as to whether an invasion of privacy is justified in the interest of law enforcement.'" *Ornelas*, 517 U.S. at 697–98 (quoting *New York v. Belton*, 453 U.S. 454, 458 (1981)). The ultimate question is whether "'the facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy

information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed.'" *United States v. Edwards*, 242 F.3d 928, 934 (10th Cir. 2001) (quoting *United States v. Maher*, 919 F.2d 1482, 1485 (10th Cir. 1990)).

### 1. *The Hidden Compartment*

The first and most significant factor invoked by the government and credited by the district court is the evidence of a hidden compartment in the back of the van driven by Ms. Concepcion-Ledesma. This Court has repeatedly held that "evidence of a hidden compartment can contribute to probable cause to search." *United States v. Mercado*, 307 F.3d 1226, 1230 (10th Cir. 2002); *see also United States v. Vasquez-Castillo*, 258 F.3d 1207, 1213 (10th Cir. 2001); *United States Anderson*, 114 F.3d 1059, 1066 (10th Cir. 1997); *United States v. Nicholson*, 17 F.3d 1294, 1297–98 (10th Cir. 1994).

In *United States v. Jurado-Vallejo*, 380 F.3d 1235, 1236 (10th Cir. 2004) ("*Jurado-Vallejo I*"), a Kansas trooper traveling on an interstate highway approached a Ford Expedition from the rear and noticed "modifications to the vehicle's bed and underbody that suggested the presence of a hidden compartment." Specifically, the trooper noticed a "lift" lowering the vehicle's underbody three inches from its bed, squared off edges on the vehicle's bed suggesting a modification from the factory model, and a suspicious seam that had been bonded and coated. *Id*. at 1236–37. We determined that "[w]hether

probable cause to search a vehicle can be based on evidence of a hidden compartment depends on two factors: (1) the probative value of the evidence—that is, the likelihood that there really is a hidden compartment; and (2) the likelihood that a vehicle with a hidden compartment would, in the circumstances, be secreting contraband." *Id.* at 1238. The second factor, we held, was "not a concern" because "[i]f the vehicle had a hidden compartment, it was highly likely to contain contraband." *Id.* Indeed, we found it "hard to conceive of a legitimate use for a large hidden storage compartment in any vehicle, let alone one with the cargo space of a Ford Expedition." *Id.* at 1238–39. The first factor, however, was difficult to evaluate based on the district court's order. We therefore remanded the case and asked the district court to make factual findings concerning the credibility of the trooper's testimony. *Id.* at 1239.

On remand the district court credited the trooper's testimony, but nonetheless held that he lacked probable cause to conduct a search. *United States v. Jurado-Vallejo*, 380 F.3d 1239, 1241 (10th Cir. 2004) ("*Jurado-Vallejo II*"). The district court emphasized that the trooper had not inspected the passenger side or undercarriage of the vehicle, and had not touched or probed any of the wheel wells. *Id.* We reversed, holding that "if the district court credited [the trooper's] testimony, there was probable cause to search." *Id.* The question is not "whether [the officer] could have done more to confirm that the vehicle had a hidden compartment," and there is no requirement that visual observations be

- 20 -

corroborated by touch or smell. *Id.* Rather, the issue is whether the evidence of a hidden compartment was sufficient to "'warrant a [person] of reasonable caution to believe that evidence of a crime will be found at the place to be searched.'" *Id.* at 1241–42 (quoting *United States v. Hernandez-Rodriguez*, 352 F.3d 1325, 1330 (10th Cir. 2003)). *Jurado-Vallejo II* stands for the proposition that visual evidence of a hidden compartment, without more, may provide probable cause to conduct or expand a search.

In this case, Troopers Ranieri and Dean observed several suspicious modifications to the vehicle immediately upon opening the back doors to the van. The side panels appeared to have been removed and reattached repeatedly, the "screws and stuff were all scarred and marked up," and the carpet and panels were no longer aligned. Appellee's Supp. App. 44–45. Trooper Ranieri's suspicion "skyrocketed" when he saw those alterations, *id.* at 45, all of which were plainly visible from the troopers' position in the back of the van, where Ms. Concepcion-Ledesma explicitly authorized them to go. *See* Mem. & Order 5 (responding that she had no contraband "in the back" and authorizing Trooper Ranieri to "look back there"). Because the evidence was highly probative of the existence of a secret compartment, and because it is difficult to imagine a licit purpose for a large hidden compartment in a vehicle the size of a Chevy van, these signs of a hidden compartment strongly suggest—and perhaps even singlehandedly establish—probable cause to search behind the side panels in the rear of the van.

- 21 -

## 2. *The Officers' Conversation with the Defendant*

Any doubts about probable cause to expand the search are dispelled by three suspicious aspects of Ms. Concepcion-Ledesma's initial conversation with Trooper Ranieri. First, the small amount of luggage in the back of the van was inconsistent with the women's stated travel plans to spend up to two weeks in Los Angeles, and their intention to "find some friends" for a two-week stay was implausible. *See United States v. Ozbirn*, 189 F.3d 1194, 1200 (10th Cir. 1999) (finding probable cause based in part on a "vague description" of travel plans); *United States v. Arango*, 912 F.2d 441, 447 (10th Cir. 1990) (finding probable cause to arrest based on evidence of a secret compartment along with "the inadequate amount of luggage in the truck for [the defendant's] purported two-week vacation"). Second, Ms. Concepcion-Ledesma denied any association with any other vehicles traveling nearby, which was suspicious because Trooper Ranieri had observed two other vehicles—including one from Michigan, judging by its license plates—traveling close together with the van in the slow lane on I-70. Third, the district court found that Ms. Concepcion-Ledesma's "extreme nervousness" contributed to probable cause. Mem. & Order 19. Although "nervousness is a sufficiently common—indeed natural—reaction to confrontation with the police," we have held that "extraordinary and prolonged nervousness can weigh significantly in the assessment" of probable cause or reasonable suspicion. *Santos*, 403 F.3d at 1127. These circumstances, together with the evidence of a

hidden compartment discovered in the course of the consensual search, easily provide probable cause for a search of the side panels of the rear of the van.

### 3. Other Factors

Other factors mentioned by the officer are of little weight under the facts of this case. There is nothing suspicious about carrying a cell phone and an atlas or road map while driving on an interstate highway, and we are puzzled as to why Trooper Ranieri believes otherwise. *See United States v. Wood*, 106 F.3d 942, 947 (10th Cir. 1997). Also, under the circumstances of this case little weight should be attached to the fact that Ms. Concepcion-Ledesma took a newly purchased van on a long trip. Travelers frequently acquire a new vehicle in anticipation of a long trip out of concern that an older vehicle will break down before reaching the destination.

We assign no weight to Trooper Ranieri's equivocal testimony that he smelled air freshener inside the vehicle. This Court "has consistently held that the scent of air freshener is properly considered as a factor in the probable cause analysis" where it might suggest a conscious attempt to mask the smell of contraband. *United States v. West*, 219 F.3d 1171, 1178 (10th Cir. 2000). But in this case, even after an exhaustive search, the police found no air freshener in the vehicle, and the officer testified that the "sweet, fruity smell could have been placed in the vehicle a few days before by the dealer or the seller." Mem. & Order 4. The district court apparently did not find this slight, perhaps non-

existent, air freshener scent suggestive of a conscious attempt to hide the smell of contraband, and neither do we.

Finally, the district court found that the "destination and route of travel" contributed to probable cause. Mem. & Order 19. When asked about her travel plans, Ms. Concepcion-Ledesma stated that she was driving from Detroit to Los Angeles. That route was suspicious, according to Trooper Ranieri, because she was "coming from an area where narcotics is [sic] usually warehoused or narcotics is [sic] stored . . . to another source city." Appellee's Supp. App. 39. On that theory, however, the route should not have been suspicious at all. The van was traveling *from* a drug "warehouse destination" *to* a drug "source city," and therefore should have been empty. Drug couriers do not transport drugs away from the warehouse and back to the source. This logical gap precludes us from relying on the route as the basis for probable cause.

### 4. *Totality of the Circumstances*

Notwithstanding our conclusion that some of the factors on which the officers relied were of little or no weight under the facts of this case, we have no hesitation in affirming the district court's finding of probable cause based on the totality of the circumstances. Troopers Ranieri and Dean had probable cause to expand their search in light of the evidence of a secret compartment, inadequate amount of luggage for a one- or two-week trip, Ms. Concepcion-Ledesma's denial of any relationship with the other Michigan vehicles traveling nearby, and the

- 24 -

women's extreme nervousness.  Their warrantless search was therefore reasonable under the automobile exception, and the district court properly denied Ms. Concepcion-Ledesma's motion to suppress.

### III. Conclusion

We **AFFIRM** the judgment of the district court.