**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 3, 2008**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

HENRY OSVALDO MARTINEZ,

    Defendant-Appellant.

No. 07-3087

---

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 06-CR-40080-RDR)**

---

Melody Evans, Assistant Federal Public Defender (David J. Phillips, Federal Public Defender, with her on the briefs), Topeka, Kansas, for Defendant-Appellant.

James A. Brown, Assistant United States Attorney (Eric F. Melgren, United States Attorney, with him on the brief), Topeka, Kansas, for Plaintiff-Appellee.

---

Before **TACHA, ANDERSON,** and **GORSUCH**, Circuit Judges.

---

**GORSUCH**, Circuit Judge.

Traffic stops based on allegedly defective temporary vehicle registration tags have given rise to a whole body of law in our court. This case presents yet another twist in that ongoing story. Today, we hold that a trooper who effected a traffic stop because an out-of-state temporary registration permit was not displayed on the rear of the car, as required by Kansas law, did not act unreasonably for purposes of the Fourth Amendment, and we affirm the district court's judgment to the same effect.

I

Kansas State Trooper Andrew Dean stopped Henry Osvaldo Martinez and his traveling companion, Jennifer Candelas, on I-70 in Riley County, Kansas, because he saw no license plate attached to the rear of Mr. Martinez's black Jeep Liberty, as required by K.S.A. § 8-133, which provides that a license plate "shall be attached to the rear" of virtually every vehicle.[1]

---

[1] K.S.A. § 8-133 provides in its entirety:

The license plate assigned to the vehicle shall be attached to the rear thereof and shall be so displayed during the current registration year or years, and no Kansas registration plate for any other year shall appear on the front of the vehicle, except that: (a) The license plate issued for a truck tractor shall be attached to the front of the truck tractor; (b) a model year license plate may be attached to the front of an antique vehicle, in accordance with K.S.A. 8-172, and amendments thereto; or (c) a personalized license plate as authorized under subsection (c) of K.S.A. 8-132, and amendments thereto, may

(continued...)

When Trooper Dean approached the Jeep and explained the problem, Mr. Martinez pointed to the front windshield, where a document was taped on the passenger's side. The document indicated that it was a "One Trip Permit" from the State of California. The permit was made out to Mr. Martinez, had the vehicle identification number or "VIN" of the Jeep, and was dated the previous day. According to the back of the permit, visible to those inside the car, it was good for, among other things, "one continuous trip from a place within this state to a place within or without this state." The front of the permit indicated that the departure point of the vehicle was Lawndale, California, and that Mr. Martinez's destination was Buffalo, New York. According to the instructions accompanying the permit, it had "to be affixed to the inside lower right-hand corner of the windshield with the face of the permit showing to the front of the vehicle," just as, in fact, it was.

---

[1](...continued)
be attached to the front of a passenger vehicle or truck. Every license plate shall at all times be securely fastened to the vehicle to which it is assigned so as to prevent the plate from swinging, and at a height not less than 12 inches from the ground, measuring from the bottom of such plate, in a place and position to be clearly visible, and shall be maintained free from foreign materials and in a condition to be clearly legible. During any period in which the construction of license plates has been suspended pursuant to the provisions of K.S.A. 8-132, and amendments thereto, the plate, tag, token, marker or sign assigned to such vehicle shall be attached to and displayed on such vehicle in such place, position, manner and condition as shall be prescribed by the director of vehicles.

Next to the permit was a "New Vehicle Dealer Notice Temporary Identification" from a California Jeep dealership purporting to show that the vehicle was originally sold new several months earlier to a Bradley R. Wirtz.

At trial, Trooper Dean, a five and a half year veteran of the Kansas state patrol, testified that he did not recognize either document, was unfamiliar with One Trip permits, and did not know whether the car was lawfully registered. So Trooper Dean asked Mr. Martinez for his license and registration, which Mr. Martinez provided along with a salvage title to the vehicle. Asked about his travel plans, Mr. Martinez replied that he was driving from Los Angeles to Buffalo to start a tattoo parlor. Mr. Martinez added that he and Ms. Candelas had a place to stay in Buffalo, but later seemed to backtrack and indicate that the pair was going to have to look for a place to stay.

Trooper Dean took the documentation to his car and ran a computer check on Mr. Martinez's license. It proved valid and no criminal history involving drugs appeared. The salvage title, however, was not signed over to Mr. Martinez, and neither did his name appear anywhere on the title. Although Mr. Martinez also provided Trooper Dean with a document indicating that the Jeep had been sold to Mr. Martinez, Trooper Dean

testified that he thought it odd that the title itself did not indicate that Mr. Martinez owned the vehicle.

Trooper Dean decided to issue a written warning for violating K.S.A. § 8-133, prepared the warning, and then returned to the Jeep. There, he handed Mr. Martinez his paperwork along with the ticket, told the driver to "have a good one," and walked back in the direction of his patrol car. Before getting there, Trooper Dean turned, retraced his steps, approached Mr. Martinez again, and inquired whether he could ask a few more questions. Mr. Martinez assented and Trooper Dean asked if he could search the Jeep. Mr. Martinez again agreed, and in a hidden compartment Trooper Dean discovered 9 kilograms of powder cocaine.

After his indictment on a single count of possession with intent to distribute, Mr. Martinez moved to suppress the drugs. In doing so, Mr. Martinez did not challenge his initial detention, conceding that Trooper Dean had sufficient cause to stop the Jeep for suspicion of violating K.S.A. § 8-133. Neither did he complain about the trooper's request, at the end of the stop, for consent to search the vehicle. Instead, Mr. Martinez focused on what we might call the middle part of his stop – after his initial detention and before the trooper's request for consent to search. Mr. Martinez contended that Trooper Dean should've immediately realized there was no traffic infraction when he saw the One Trip permit attached to the front

windshield in accord with California law; Mr. Martinez's continued detention while Trooper Dean prepared a written warning was, he alleged, unreasonable under the Fourth Amendment.

The district court denied the motion to suppress, reasoning that K.S.A. § 8-133 requires license plates to be placed on the rear of vehicles in Kansas; that the law applies to temporary registrations tags, as well as out-of-state vehicles; and that Mr. Martinez's display of his tag on the front of his vehicle was therefore unlawful. Given all this, the court reasoned, Mr. Martinez's detention while the trooper prepared a ticket was reasonable. Following the district court's ruling, Mr. Martinez pled guilty, reserving the right to challenge the adverse suppression ruling on appeal.

II

Traffic stops in connection with allegedly defective out-of-state and temporary tags have given rise in our circuit to a long line of Fourth Amendment cases. *See*, *e.g.*, *United States v. Ledesma*, 447 F.3d 1307 (10th Cir. 2006); *United States v. Edgerton*, 438 F.3d 1043 (10th Cir. 2006); *United States v. DeGasso*, 369 F.3d 1139 (10th Cir. 2004); *United States v. McSwain*, 29 F.3d 558 (10th Cir. 1994); *United States v. Arciga-Bustamante*, 2006 WL 1659779 (10th Cir. 2006). But none of these cases answers directly the narrow question posed to us. Because Mr. Martinez does not challenge the beginning or end of his particular stop, the only

question we are called upon to answer is whether, after having viewed the One Trip permit but before he sought permission to search, Trooper Dean had reasonable suspicion of a traffic infraction to justify detaining Mr. Martinez while he prepared and issued a ticket. Because no material dispute of fact exists between the parties, this appeal poses purely a question of law that we consider *de novo*, namely whether the trooper's conduct was objectively reasonable in light of existing Fourth Amendment jurisprudence. A traffic stop, after all, must be reasonable for Fourth Amendment purposes not merely in its inception but throughout its duration and in the entirety of its scope.

In approaching this question, we begin where the district court did: with the plain language of K.S.A. § 8-133. That statute expressly requires that "[t]he license plate assigned to the vehicle shall be attached to the *rear thereof*." *Id.* (emphasis added). And it is undisputed that Mr. Martinez's permit was posted on the front, rather than the back, of the vehicle. So, syllogistically, it would appear, at least on first blush, that the statute rather straightforwardly gave the trooper a reasonable basis for suspecting an ongoing traffic infraction and thus for detaining Mr. Martinez, at least for a period sufficient to write a ticket.

Before us, Mr. Martinez does not allege that his detention exceeded the period appropriate for the preparation of a traffic ticket, but argues

instead that, in his view, after seeing the One Trip permit, Trooper Dean immediately should've let Mr. Martinez go on his way, the apparently plain language of K.S.A. § 8-133 notwithstanding. In support of his cause, Mr. Martinez offers several arguments.

1. Mr. Martinez contends that, read in context, the requirement that a license plate be displayed on the rear of the car applies only to license plates issued by the State of Kansas, not out-of-state plates. But the first clause of the first sentence of K.S.A. § 8-133 makes no mention of *Kansas* license plates, and instead refers generically to the "license plate assigned to the vehicle," thus suggesting its application to *all* vehicles operated in the state. *Id*. To our minds, this reading is confirmed by the fact that, in the very same sentence, the Legislature placed an express limitation on placement of old *Kansas* license plates ("no Kansas registration plate for any other year shall appear on the front of the vehicle, except that . . ."). *Id*. Where the Legislature wished to single out *Kansas* license plates, then, it seemed to do so expressly, and it is our practice to give respect and meaning to a legislative decision to employ different language in different parts of the same statute. As the Supreme Court has instructed, "when the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended."

*Sosa v. Alvarez-Machain*, 542 U.S. 692, 712 n.9 (2004) (internal quotations omitted).  We see no reason to depart from that practice here.[2]

2.      Mr. Martinez points us to Kansas's motor vehicle reciprocity statute, K.S.A. § 8-138a,[3] and argues that, by its terms, his compliance with California motor vehicle laws sufficed to render him in compliance with Kansas law.  We think this argument fails for two reasons.

a.      In the first place, Kansas appears not to have read its motor vehicle reciprocity statute so broadly.  In *State v. Hayes*, 660 P.2d 1387 (Kan. Ct. App. 1983), the Kansas Court of Appeals suggested that, while an out-of-state driver who complies with his or her home state's licensing laws

---

[2] The district court held that K.S.A. § 126a, which defines temporary permits as license plates, includes temporary out-of-state permits, and thus California's One Trip permit is a "license plate" within the meaning of Kansas law.  *Cf. Edgerton*, 438 F.3d at 1046 n.2.  Although Mr. Martinez appears to raise this issue in his reply brief on appeal, he did not challenge the district court's ruling in his opening brief, and thus this argument is waived.  *Headrick v. Rockwell Int'l. Corp.*, 24 F.3d 1272, 1277-78 (10th Cir. 1994) (White, J., sitting by designation).

[3] K.S.A. § 8-138a provides that:

The provisions of this section shall apply only to the nonresident owner or owners of any motor vehicle constructed and operated primarily for the transportation of the driver or the driver and one or more nonpaying passengers.  Such nonresident owners, when duly licensed in the state of residence, are hereby granted the privilege of operation of any such vehicle within this state to the extent that reciprocal privileges are granted to residents of this state by the state of residence of such nonresident owner.

is granted "the privilege of *operat[ing]*" a motor vehicle in Kansas, K.S.A. § 8-138a (emphasis added), this does not mean that the *manner* in which such a motor vehicle is operated is "total[ly] exempt[] from Kansas law." *Hayes*, 660 P.2d at 1389. The court in *Hayes* then went on to state that "the display of an illegible or obscured vehicle tag is a violation of K.S.A. § 8-133 *even if the vehicle is duly licensed in another state*." *Id*. (emphasis added). We have already read *Hayes* to just this effect, *Ledesma*, 447 F.3d at 1313, and are of course bound not just by Kansas's interpretation of its own law but also by our own precedent.[4]

To be sure, we face today the application of a slightly different portion of K.S.A. § 8-133 – not its prohibition against obscuring a license plate, as in *Hayes* and *Ledesma*, but its related specifications about where the plate should be placed in order to be most visible. And *Hayes*, of course, did not definitively hold that out-of-state drivers are subject to *all* Kansas regulations concerning the manner in which they operate their vehicles, indicating rather that out-of-state vehicles are not "total[ly] exempt[]" from Kansas laws. However, the court's decision in *Hayes* rested on "[t]he

---

[4] The case cited by Mr. Martinez, *State v. Wakole*, 959 P.2d 882 (Kan. 1998), says nothing generally about whether the reciprocity statute exempts out-of-staters authorized to operate vehicles in Kansas from complying with provisions of Kansas law about the *manner* of operation and likewise does not specifically address K.S.A. § 8-133.

purpose of requiring display of a tag in the first place, and legibility of the tag displayed," namely to facilitate "routine license plate check[s]." *Hayes*, 660 P.2d at 1389. The inclusion of both of these regulations in the same section of the Kansas code suggests that they have the same purpose, and Mr. Martinez offers no reasoned basis why Kansas would be inclined to enforce one clause of K.S.A. § 8-133 but not another against out-of-state vehicles, or why the rear placement of license plates is any more or less important to Kansas than its dictates about keeping plates themselves free from obstructions.[5]

While one might argue that Kansas seems tough on out-of-staters – requiring them to move temporary tags from the front to the back as they pass through Kansas – we are not free to rewrite Kansas law. Our obligation instead is to follow the law of Kansas as set forth in *Hayes* and interpreted in *Ledesma*. In passing, Mr. Martinez replies that *Hayes* and *Ledesma*'s understanding of Kansas's reciprocity statute may be so narrow that it amounts to an unconstitutional burden on his right to travel, an argument that would of course trump any application of Kansas law. But this contention appears only in a fleeting sentence at the conclusion of Mr. Martinez's opening brief, supported by no analysis or citation; without any

---

[5] We do not, of course, foreclose an argument in the future by noting we have not been presented with one to decide in this case.

-11-

such development, our precedent instructs us to deem the point waived and leave any such challenge for another day. *See Williams v. W.D. Sports, N.M., Inc.*, 497 F.3d 1079, 1095 (10th Cir. 2007).

b.    Even if the reciprocity statute authorized not only Mr. Martinez's operation of the Jeep in Kansas but also his non-compliance with K.S.A. § 8-133's dictates about the placement of his temporary tag, one might ask whether a reasonable officer is fairly chargeable, for Fourth Amendment purposes, with knowledge of obscure details of the motor vehicle licensing regimes of distant states. While run of the mine out-of-state license plates cannot reasonably be presumed invalid *per se*, Trooper Dean testified that in his five and half year career he had never seen a One Trip permit, there is apparently no analog to it in Kansas law, and we have previously held that state troopers "cannot be expected to possess encyclopedic knowledge of the traffic regulations of other states." *Ledesma*, 447 F.3d at 1313. Mr. Martinez himself concedes, too, that a reasonable officer "would not be expected" to possess knowledge of the arcania of distant states' licensing regimes. Op. Br. at 27. It therefore seems to us that, under these particular circumstances and on this record, even if the reciprocity statute might've afforded Mr. Martinez a good defense against any effort to prosecute him for a violation of K.S.A. § 8-133, we cannot say that, for the purposes of the Fourth Amendment, the trooper's skepticism about the propriety of the

permit and its placement, as well as his concomitant decision to detain Mr. Martinez briefly to run a computer check, was objectively unreasonable.

3. Whatever the impact of the reciprocity statute, Mr. Martinez argues that our decision in *Edgerton* controls this case and requires its reversal. A limited number of remarkable parallels in the two cases cannot be denied. *Edgerton* involved the self-same Trooper Dean now before us, pulling over a car for violating the very statute now at issue before us. And, as here, Trooper Dean was unable to see any license plate on the rear of defendants' car and effected a stop.

But from there, the cases diverge. After the stop in *Edgerton*, the driver drew Trooper Dean's attention to a Colorado temporary license tag that was visibly affixed to the rear window. Trooper Dean nonetheless continued the detention for purposes of writing a warning for a putative violation of K.S.A. § 8-133. After issuing the warning, Trooper Dean, just as here, briefly walked away only to return and ask for permission to search the vehicle, soon to discover drugs. We held that, while the initial stop was reasonable under the Fourth Amendment, once Trooper Dean saw that a tag existed, that it *was* properly placed on the rear of the car, and given that he had no basis for suspecting its invalidity, "any suspicion that Defendant had violated § 8-133 dissipated." 438 F.3d at 1051; *see also McSwain*, 29 F.3d

at 561 (holding that traffic stop should've ended when any reasonable suspicion of traffic infraction dissipated).

By contrast, in our case reasonable concern about a possible infraction of Kansas's law requiring display of a license plate on the rear of a vehicle, minor though such an infraction may be, did *not* dissipate once Trooper Dean approached and viewed the One Trip permit. In fact, closer inspection *confirmed* that no license plate was affixed to the rear of the Jeep as required by K.S.A. § 8-133, and thus supported the detention of Mr. Martinez for a reasonable time to prepare a traffic citation – a period the trooper, again, is not alleged to have exceeded.

4.    Mr. Martinez charges that Trooper Dean decided to issue the warning under K.S.A. § 8-133 not out of concern over the temporary tag's placement on the front of the Jeep but because he (wrongly) thought it was illegible. As the government points out, however, Trooper Dean testified that he thought the placement of the tag, and not merely its legibility, violated Kansas law. In any event, the trooper's subjective intent is not relevant to a Fourth Amendment analysis, *see, e.g., United States v. Santana-Garcia*, 264 F.3d 1188, 1192 (10th Cir. 2001); instead, our charge is to ask whether, from an objective point of view, reasonable suspicion

existed that Mr. Martinez had violated K.S.A. § 8-133 and, for reasons

already explored, we agree with the district court that it did.

*Affirmed.*