FILED
United States Court of Appeals
Tenth Circuit

November 16, 2011

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

DAMON L. HUNTER,

Defendant - Appellant.

No. 10-3266

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(D.C. NO. 5:09-CR-40084-JAR-1)**

---

Ryan M. Pacyga, Minneapolis, Minnesota, for Appellant.

Jared S. Maag, Assistant United States Attorney (Barry R. Grissom, United States Attorney, with him on the brief), Topeka, Kansas, for Respondent.

---

Before **MURPHY, ANDERSON,** and **HARTZ,** Circuit Judges.

---

**ANDERSON**, Circuit Judge.

---

Defendant and appellant Damon Hunter appeals the denial of his motion to suppress evidence gathered from a vehicle in which he was traveling. For the following reasons, we affirm the denial of his motion to suppress.

## BACKGROUND

On August 28, 2009, Kansas Highway Patrol Trooper Chris Nicholas was patrolling Interstate 70 in Wabaunsee County, Kansas. More particularly, Trooper Nicholas was participating in a special assignment known as the "TOPS" program, in which troopers would watch for safety issues through a semi-trailer truck ("semi") equipped with cameras. Other officers would watch for violations by following either the semi or patrolling regular traffic.

At 7:15 a.m. on that day, Trooper Nicholas was traveling eastbound in the passing lane when he observed a Dodge vehicle following closely behind a semi in the regular driving lane. Driving conditions were normal. The trooper testified at the suppression hearing that the Dodge vehicle was traveling approximately one second behind the semi, which the trooper testified is too close because two seconds is viewed as the minimum safe driving distance. After observing the Dodge for some ten to fifteen seconds, Trooper Nicholas decided to stop the Dodge.

After the Dodge was stopped, Trooper Nicholas turned off his squad car lights and approached the passenger side of the Dodge. The trooper explained to the occupants of the vehicle, Mr. Hunter (in the passenger seat) and a woman later identified as Alice Isaacson (the car driver), that he had pulled them over for driving too closely behind the semi. The trooper then asked for and obtained a driver's license for Ms. Isaacson, as the driver, and the rental papers for the car.

-2-

Both the driver and the passenger assured Trooper Nicholas that, although the rental papers looked like they had expired two days earlier, that was not really accurate because they had, in fact, extended the rental of the car. The trooper also asked the defendant, Mr. Hunter, to identify himself and produce identification. Mr. Hunter did so with a Minnesota driver's license. Trooper Nicholas then noticed that the driver, Ms. Isaacson, appeared tired. He told both Mr. Hunter and Ms. Isaacson that he was going back to his patrol car to issue a warning ticket.

While he was at his patrol car, Trooper Nicholas ran a criminal background check on the licenses from both Mr. Hunter and Ms. Isaacson. The trooper then asked Ms. Isaacson to come back to his patrol car, because he wanted to know why Ms. Isaacson's driver's license listed a Kansas City address, while Mr. Hunter had produced a Minnesota license. Trooper Nicholas subsequently asked Ms. Isaacson about the nature of the trip and the rental contract. Ms. Isaacson explained that she and Mr. Hunter were friends and that they were coming from a wedding near Colorado Springs, where they were friends with both the groom and the bride. She further stated that the rental contract had been extended. Trooper Nicholas testified that Ms. Isaacson looked straight ahead during their conversation, rarely making eye contact with him. The trooper then directed Ms. Isaacson to return to the car and tell Mr. Hunter to come back to the

patrol car so he could answer a few questions about the rental papers, "just to make sure."

When Mr. Hunter came to the patrol car, Trooper Nicholas asked him about the rental contract and whether he had extended it. Mr. Hunter indicated the car was supposed to be returned in Minnesota "on Wednesday" and that he was supposed to extend the rental contract, but he had not. Mr. Hunter further told the trooper that he and Ms. Isaacson had been at a wedding in Colorado Springs where they were friends with both the bride and groom. When Trooper Nicholas asked Mr. Hunter about the wedding, Mr. Hunter indicated that Ms. Isaacson had been pressing him to get married, but then stated that they had been friends forever. Mr. Hunter returned to the Dodge.

After waiting several more minutes for the background check results, Trooper Nicholas decided to let them proceed and returned to the Dodge. He testified at the suppression hearing that, at that point, he intended to return Mr. Hunter's and Ms. Isaacson's documentation and terminate the traffic stop. The trooper then did, in fact, return their documentation to Mr. Hunter and Ms. Isaacson, He explained the two-second rule to Ms. Isaacson and Mr. Hunter and explained that a semi could not see their car if they traveled too closely behind it. The trooper then told Mr. Hunter and Ms. Isaacson to have a safe trip and said "thank you."

After taking a few steps away from the Dodge, Trooper Nicholas turned back and asked if he could ask Mr. Hunter and Ms. Isaacson a few more questions. Mr. Hunter responded, "yes." When the trooper asked Mr. Hunter if he would take care of the rental contract, Mr. Hunter said he would and explained that he just lacked sufficient funds when he rented the car to pay for the full time necessary. Trooper Nicholas then asked them if they had anything illegal in the car, to which Mr. Hunter said "no." The trooper asked if he could search the car, and Mr. Hunter and Ms. Isaacson looked at each other but did not say anything. When the trooper insisted on a "yes or no" answer, Mr. Hunter said he did not see a reason for the search. He and Ms. Isaacson again exchanged glances with no words spoken. Finally, Ms. Isaacson took the keys out of the ignition and, reaching across Mr. Hunter, gave them to Trooper Nicholas through the passenger window. Mr. Hunter did nothing, and said nothing, to stop her.

The trooper first searched the rear of the car, looking under the spare tire, and then eventually he went to the driver's side rear door. When he opened that door, a book fell out and he asked if Ms. Isaacson and Mr. Hunter were taking classes. Trooper Nicholas noticed a suitcase in the back seat and smelled an odor of marijuana when he put his head inside the car. He asked Ms. Isaacson and Mr. Hunter if they were sure there was nothing illegal in the car because it "kinda smells like weed." Without asking who owned the suitcase, Trooper Nicholas

opened it and found a clear wrapped bundle of what appeared to be marijuana. Trooper Nicholas then arrested both Ms. Isaacson and Mr. Hunter.

When the car was impounded and searched, police found thirty-five pounds of marijuana, one kilogram of cocaine, and a weapon in the console. Mr. Hunter was indicted on one count of possession with the intent to distribute 500 grams or more of powder cocaine, one count of possession with the intent to distribute a detectable amount of marijuana, one count of being a felon in possession of a firearm, and one count of possession of a firearm in furtherance of a drug trafficking offense.[1]

Mr. Hunter filed a motion to suppress the evidence seized from the car. A hearing was held and the district court denied his motion to suppress. Mr. Hunter entered a conditional plea of guilty and was sentenced to 60 months' imprisonment. This appeal followed, in which Mr. Hunter argues the district court erred in denying his motion to suppress on the ground that (1) the Kansas statute prohibiting a motorist from following "another vehicle more closely than is reasonable and prudent" is unconstitutionally vague as applied to him; (2) Trooper Nicholas lacked reasonable suspicion to stop Mr. Hunter's vehicle for following too closely; (3) the detention of Mr. Hunter was impermissibly prolonged and not reasonably related to the justification for the stop; and (4) Ms.

_____

[1]As it turned out, Mr. Hunter and Ms. Isaacson had prior convictions for drug and/or firearms offenses.

Isaacson did not have authority, apparent or otherwise, to give consent to search the car.

**DISCUSSION**

"In reviewing the district court's denial of a motion to suppress, we review the court's factual findings for clear error and view the evidence in the light most favorable to the government." United States v. Worthon, 520 F.3d 1173, 1178 (10th Cir. 2008). We review de novo the reasonableness of a search or a seizure under the Fourth Amendment. Id. "The credibility of witnesses, the weight accorded to evidence, and the reasonable inferences drawn therefrom fall within the province of the district court." Id. Finally, the question of whether a particular person has standing to challenge a search is reviewed de novo. Id.

### I. Constitutionality of statute

Mr. Hunter was stopped for following a semi too closely on I-70, in violation of Kan. Stat. Ann. § 8-1523(a), which provides as follows:

> The driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of such vehicles and the traffic upon and the condition of the highway.

Mr. Hunter argues that this statute is unconstitutionally vague as applied to his stop because the term "reasonable and prudent" is too subjective to inform

ordinary drivers as to its meaning, and the statute does not establish minimum standards to guard against discriminatory enforcement. The district court concluded that the statute was not void for vagueness, a determination that we review de novo. See United States v. Ransom, 642 F.3d 1285, 1288 (10th Cir. 2011).

"[T]he void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." United States v. Graham, 305 F.3d 1094, 1105 (10th Cir. 2002) (further quotation omitted). See Kolender v. Lawson, 461 U.S. 352, 357 (1983); United States v. Apollo Energies, Inc., 611 F.3d 679, 688 (10th Cir. 2010). When a court considers a vagueness challenge to a penal statute, it must begin with "the presumption that the statute comports with the requirements of federal due process and must be upheld unless satisfied beyond all reasonable doubt that the legislature went beyond the confines of the Constitution." United States v. Welch, 327 F.3d 1081, 1094 (10th Cir. 2003) (further quotation omitted). And, "[c]ourts should remain ever mindful that 'general statements of the law are not inherently incapable of giving fair and clear warning.'" Id. at 1094 (quoting United States v. Lanier, 520 U.S. 259, 271 (1997)). "[A]ll that is required is that the language 'conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices. . . .'"

Roth v. United States, 354 U.S. 476, 491 (1957) (quoting United States v. Petrillo, 332 U.S. 1, 8 (1947)).  With respect to the statute in question, we must also keep in mind that this is a misdemeanor traffic regulation statute, enacted for the safety of the driving public.

Mr. Hunter cites no authority on point in support of his position.  On the other hand, as the district court and the government both emphasize, identical or very similar "reasonable and prudent" standard statutes are ubiquitous throughout the United States, and have been uniformly upheld against constitutional challenges.  See, e.g., United States v. Mendez-Cejas, 2009 WL 914873, at *4 (D. Nev. Jan. 15, 2009), aff'd, 2009 WL 961464 (D. Nev. April 2, 2009); United States v. Johnson, 2006 WL 435975, at **3-4 (W.D.N.C. Feb. 21 2006), aff'd, 258 Fed. Appx. 510 (4th Cir. 2007); Smith v. State, 237 So. 2d 139 (Fla. 1970); United States v. Marmolejo, 2007 WL 915195 (S.D. Ohio 2007); State v. Coppes, 78 N.W.2d 10 (Iowa 1956); State v. Shapiro, 751 So. 2d 337, 341-42 (La. Ct. App. 1999); State v. Giovengo, 692 So. 2d 462 (La. Ct. App. 1997); State v. Heid, 270 N.Y.S.2d 474 (N.Y. Cnty. Ct. 1966); State v. Quinones, 2003 WL 22939467, at **4-5 (Oh. Ct. App. 2003); State v. Bush, 182 N.E.2d 43 (Ohio Misc. 1962); State v. Harton, 108 S.W.3d 253, 260 (Tenn. Crim. App. 2002); Logan City v. Carlsen, 585 P.2d 449 (Ut. 1978).

As these cases make clear, imprecision in statutes such as the one here simply build in needed flexibility while incorporating a comprehensible,

normative standard[2] easily understood by the ordinary driver, and giving fair warning as to what conduct on his or her part is prohibited. Further, references in these statutes to considerations such as speed, traffic and road conditions, channel enforcement.

For those same reasons, we hold that Kan. Stat. Ann. § 8-1523(a) is not unconstitutionally vague as applied to Mr. Hunter.

## II. Reasonable suspicion to stop car

Mr. Hunter next argues that Trooper Nicholas did not have reasonable suspicion to stop Mr. Hunter's car for traveling too closely in violation of § 8-1523(a). "Whether a traffic stop is valid under the Fourth Amendment turns on whether 'this particular officer had reasonable suspicion that this particular motorist violated any one of the multitude of applicable traffic and equipment regulations of the jurisdiction.'" United States v. Vercher, 358 F. 3d 1257, 1261 (10th Cir. 2004) (quoting United States v. Botero-Ospina, 71 F.3d 783, 787 (10th Cir. 1995)).

The district court found the following facts, which are not disputed on appeal. Trooper Nicholas was patrolling l-70, under normal weather and road

---

[2]By way of illustration, in upholding a following-too-closely/reasonable and prudent standard statute, the Tennessee Court of Criminal Appeals cited ten criminal statutes and various cases using the "reasonable" standard in other contexts. Harton, 108 S.W.3d at 259-60.

conditions, when he observed Mr. Hunter's Dodge closely following a semi. He observed the Dodge for ten to fifteen seconds and estimated that it was approximately one second behind the semi, and probably in the truck's blind spot. According to Trooper Nicholas, two seconds is a safe following distance, a measurement recommended by the Kansas Highway Patrol, and which is contained in the Kansas Driver's Handbook. Because of the approximately one-second spacing, Trooper Nicholas pulled the Dodge over for violating § 8-1523. The district court found the Trooper's testimony regarding the two-second rule and the estimated interval of about one second to be credible.

As indicated, Mr. Hunter does not dispute that the Trooper stopped him for following about one second behind a semi on an interstate highway, or that the Trooper suspected and articulated that such an interval was a violation of the Kansas statute. Rather, Mr. Hunter's sole argument is that in Vercher this court did not talk about seconds, but, instead, about speed and distance. Thus, he argues: "Because the Tenth Circuit requires at least two factors to be present (speed and distance) for an officer to have a reasonable articulable suspicion that a driver has violated a traffic law, and because here, the trooper only possibly satisfied one of the four factors, the traffic stop was not justified at its inception . . . ." Appellant's Br. at 21.

There are two problems with this argument. First, as the district court noted, Vercher did not establish a two-factor rule for applying § 8-1523(a), i.e., a

-11-

separate figure for speed and for distance.  It determined what was sufficient reason for a stop in that case and "some cases."  Vercher, 358 F.3d at 1263.  It did not rule out timed intervals as another method for taking speed and distance into account.  Second, and more directly to the point, we have specifically approved the two-second rule as supporting reasonable suspicion to effect a traffic stop under § 8-1523(a).  United States v. Nichols, 374 F.3d 959 (10th Cir. 2004), cert. granted and opinion vacated to allow resentencing under Booker v. United States, 543 U.S. 220 (2005); opinion reinstated, 410 F.3d 1186 (10th Cir. 2005).  As we stated in Nichols:

> We reject Nichols' argument that Trooper Weigel's use of a two-second "rule of thumb" to determine the Buick was following the vehicle in front of it too closely was improper.
>
> * * *
>
> Weigel explained it was in accord with his training and common practice in his department to use the two-second rule to determine violations of [Kan. Stat. Ann. § 8-1523(a)].  The district court found his testimony "clear and credible" and concluded from it that "[t]he government ha[d] met its burden of showing . . . reasonable suspicion that a violation had occurred."  We believe Weigel's use of a two-second rule of thumb together with his calculation of the interval three separate times provided the "minimal level of objective justification" required for reasonable suspicion justifying a traffic stop.

Nichols, 374 F.3d at 965 (citations omitted).

Nichols accordingly resolves this case.[3]  Trooper Nicholas's use of the two-second rule of thumb and determination that Mr. Hunter's car was following a semi at about a one-second interval on an interstate highway, under normal traffic and road conditions, together with his ten to fifteen second observations, incorporated "due regard" for the statutory factors and provided the minimal level of objective justification required for reasonable suspicion that Mr. Hunter's car was proceeding in violation of § 8-1523(a).

### III.  Length of detention

Having concluded that the initial stop of Mr. Hunter's car was legitimate, we now consider whether the detention of the car and Mr. Hunter were "reasonably related in scope to the circumstances which justified the interference in the first place," as required by Terry v. Ohio, 392 U. S. 1, 20 (1968).  "It is well established that:  A law enforcement officer conducting a routine traffic stop may request a driver's license and vehicle registration, run a computer check and issue a citation."  United States v. Villa, 589 F.3d 1334, 1339 (10th Cir. 2009).  Trooper Nicholas did just those things in this investigatory stop.  We agree with the district court that there is no evidence that the stop was prolonged beyond what was necessary to effectuate the purpose of the stop.  Indeed, Trooper

---

[3]In State v. Moore, 154 P.3d 1, 7 (Kan. 2007), the Kansas Supreme Court approved of the rationale used in both Vercher and Nichols.

Nicholas evidently grew impatient with the length of time that it was taking to retrieve the background checks of Mr. Turner and Ms. Isaacson and actually returned their documents to them before he received all of that information. Thus, the detention was relatively brief and did not exceed what was necessary to accomplish the purpose of the stop. After returning their papers, Trooper Nicholas told Mr. Hunter and Ms. Isaacson to have a safe journey, and he walked away from the car.

### IV. Validity of consent to search

What happened next raises the issue of whether Mr. Hunter and/or Ms. Isaacson gave a valid consent to the search which led to the discovery of the drugs and weapon in the car. The government argues Ms. Isaacson gave a valid consent to Trooper Nicholas to search the car. Mr. Hunter argues that any consent was invalid because a reasonable person would not have felt free to leave when Trooper Nicholas turned around and immediately began asking questions; Ms. Isaacson, who was not listed on the rental car agreement as the rental car driver, lacked authority to consent to a search; and Mr. Hunter, who was the listed driver on the rental car agreement, did not give explicit consent to search.

Mr. Hunter concedes that there is no legal authority which expressly states that only the named person on a rental car agreement can authorize a search of a rented car. We are aware of no such authority either. Our cases have held that a

-14-

third party may have actual authority to consent to a search "if that third party has either (1) mutual use of the property by virtue of joint access, or (2) control for most purposes." United States v. Andrus, 483 F.3d 711, 716 (10th Cir.) (further quotation omitted), amended by, 499 F.3d 1162 (2007). Furthermore, even if, for some reason, Ms. Isaacson lacked actual authority, she had apparent authority to consent. A person can have apparent authority if "the facts available to the officers at the time they commenced the search would lead a reasonable officer to believe the third party had authority to consent to the search." Andrus, 483 F.3d at 716. "[A] third party has apparent authority if the officer has a reasonable belief that the third party has (1) mutual use of the property by virtue of joint access, or (2) control for most purposes over it." United States v. Cos, 498 F.3d 1115, 1128 (10th Cir. 2007) (further quotation omitted). Ms. Isaacson was legally driving the rental car, with a legal driver's licence, and she was as entitled, apparently or in fact, as Mr. Hunter to consent to a search of the car.

Additionally, Mr. Hunter concedes that a police officer is not required to tell someone that he/she is free to leave the scene of a police/citizen encounter, nor is an officer required to inform a suspect that he/she need not answer questions. See United States v. Ledesma, 447 F.3d 1307, 1314 (10th Cir. 2006) ("The Supreme Court has held that officers need not expressly inform suspects that they are free to go before requesting permission to conduct a search."). Rather, "[v]oluntariness is a question of fact to be determined from all the

-15-

circumstances." Id. (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 248-49 (1973)). "The central question is whether a reasonable person would believe he was free to leave or disregard the officer's request." Id. (further quotation omitted).

As Ledesma instructs us:

> we have identified a number of factors that suggest that an encounter was not consensual, including the "threatening presence of several officers," the "use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory," the "prolonged detention of a person's personal effects such as identification," the "absence of other members of the public" and the officer's failure to advise the defendant that she is free to leave.

Ledesma, 447 F.3d at 1314. As we have also stated, "[p]hrases like 'thank you' and 'have a safe one' signal the end of an encounter, and afford a defendant an opportunity to depart." Id. at 1315. In view of our precedents, and having reviewed the video of the traffic stop, we can easily conclude that the district court did not err in determining that the encounter between Mr. Hunter and Trooper Nicholas had become a consensual one by the time Trooper Nicholas searched the car driven by Ms. Isaacson.

## CONCLUSION

For the foregoing reasons, we AFFIRM the denial of the motion to suppress.