**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**January 9, 2013**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

ENRIQUE RIVERA DE LA CRUZ, also
known as Enrique Rivera-De La Cruz,
also known as Enrique Rivera,

      Defendant - Appellant.

No. 11-5114

---

**Appeal from the United States District Court**
**for the Northern District of Oklahoma**
**(D.C. No. 4:11-CR-00029-GKF-1)**

---

William D. Lunn, Tulsa, Oklahoma, for Defendant-Appellant De La Cruz.

Ryan L. Souders, Assistant United States Attorney (Thomas Scott Woodward, United
States Attorney, Matthew P. Cyran, Assistant United States Attorney, on the brief, and
Danny C. Williams, Sr., United States Attorney, on the supplemental brief), Tulsa,
Oklahoma, for Plaintiff-Appellee United States of America.

---

Before **BRISCOE,** Chief Judge, **SEYMOUR,** and **EBEL,** Circuit Judges.

---

**EBEL**, Circuit Judge.

---

In this direct criminal appeal, Defendant-Appellant Enrique De La Cruz challenges the district court's decision to deny his motion to suppress evidence the United States obtained during an investigative seizure. Having jurisdiction under 28 U.S.C. § 1291, we REVERSE the denial of De La Cruz's suppression motion.

## I. BACKGROUND

The evidence presented at the suppression hearing, viewed in the light most favorable to the Government, see United States v. Hunter, 663 F.3d 1136, 1141 (10th Cir. 2011), established the following: On Sunday morning, February 13, 2011, three Immigration and Customs Enforcement ("ICE") agents were at Gill's Truck Wash in Tulsa, Oklahoma. They were looking for Juan Guel-Rivera, thought to be unlawfully in the United States. Guel-Rivera purportedly worked at the truck wash.

Because the truck wash was closed, there was no one there when the agents arrived. Soon thereafter a car with dark tinted windows drove up to the truck wash to drop off a passenger. One of the three ICE agents, John Stanko, got a one- to two-second glimpse of the driver through the windshield as the car drove by the agents. Comparing that brief glimpse to the photo that Agent Stanko had of Guel-Rivera, the agent thought that the car's driver might be Guel-Rivera. The agents, therefore, activated their emergency lights and parked their two vehicles behind the suspect's car, blocking its exit.

The car's driver was, in fact, De La Cruz, who was dropping off his brother Armando for work at the truck wash. Armando was in the front passenger seat of the car,

2

while his wife and De La Cruz's wife and mother-in-law were in the back seat.

Armando, carrying his sack lunch, was in the process of exiting the passenger side of the car when Agent Stanko got out of his vehicle and ordered De La Cruz, who had his window rolled down, to turn off the engine, place the keys on top of the car and get out of the vehicle. As De La Cruz did so, Armando ran away. Stanko and one of the other two ICE agents gave chase, apprehending Armando two hundred yards away and discovering that he was in the United States illegally.

When Armando tried to flee from the ICE agents, De La Cruz remained beside the car and the rest of his family stayed in the vehicle. The third ICE agent handcuffed De La Cruz "for safety reasons" and waited with him until the other two agents returned with Armando. (R. v.2 at 58.)

When Agent Stanko returned, it became apparent to him that De La Cruz was not Guel-Rivera, the man for whom the agents had been looking. Nevertheless, Agent Stanko continued to detain De La Cruz and asked to see some identification. De La Cruz presented an Oklahoma identification card which the agents recognized to be fake. Using the information on the card, the agents discovered that De La Cruz was unlawfully in the United States after having been previously deported. On that basis, the agents arrested him. While in custody and after receiving <u>Miranda</u>[1] warnings, De La Cruz confirmed the immigration information the agents had about him.

---

[1] <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

A federal grand jury indicted De La Cruz for unlawfully reentering the United States after a previous deportation, in violation of 8 U.S.C. § 1326(a). De La Cruz moved to suppress the evidence agents obtained from him at the truck wash, arguing that, at the time the agents asked him for his identification, they were no longer justified in detaining him because the agents no longer had reasonable suspicion to believe that De La Cruz was involved in criminal activity. After conducting an evidentiary hearing, the district court denied De La Cruz's suppression motion. He then entered a conditional guilty plea, see Fed. R. Crim. P. 11(a)(2), reserving the right to appeal the district court's suppression ruling. This appeal followed.

## II. STANDARD OF REVIEW

In reviewing the denial of a suppression motion, this court views the evidence in the light most favorable to the Government and accepts the court's factual findings unless clearly erroneous. See Hunter, 663 F.3d at 1141. We review de novo the ultimate determination of the reasonableness of a search or seizure under the Fourth Amendment. See id.

## III. ANALYSIS

The district court denied De La Cruz's suppression motion on alternate bases, holding 1) the agents had reasonable suspicion to believe De La Cruz was involved in criminal activity sufficient to justify his continued detention while agents obtained his identification; and, alternatively, 2) De La Cruz's identification is never suppressible even if there was an unlawful seizure. We conclude the district court erred in reaching

4

both of these conclusions.

**A.  The district court erred in determining that the agents had reasonable suspicion to continue to detain De La Cruz in order to obtain his identification**

The Fourth Amendment protects citizens from "unreasonable searches and seizures" by government officials.  U.S. Const. amend. IV; see United States v. Burleson, 657 F.3d 1040, 1044-45 (10th Cir. 2011).  The Government bears the burden of proving that a seizure is reasonable.  See United States v. Kitchell, 653 F.3d 1206, 1216 (10th Cir.), cert. denied, 132 S. Ct. 435 (2011).

This case involves an investigative, or Terry[2], stop, which is a seizure for Fourth Amendment purposes.  See Burleson, 657 F.3d at 1045.  Such a seizure is reasonable if it is justified by articulable reasonable suspicion that the person detained has committed or is about to commit a crime.  See Florida v. Royer, 460 U.S. 491, 498 (1983).  Reasonable suspicion is "something more than an inchoate and unparticularized suspicion or hunch," but "is considerably less than proof by a preponderance of the evidence or [proof] required for probable cause."  United States v. Chavez, 660 F.3d 1215, 1221 (10th Cir. 2011) (internal quotation marks omitted).  Reasonable suspicion is measured by an objective standard; the agents' subjective beliefs and intentions, therefore, are irrelevant. See Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2082 (2011); Chavez, 660 F.3d at 1222.

In considering whether an investigative stop is reasonable, we conduct a two-step inquiry, asking first whether the detention was justified at its inception and, second,

---

[2] Terry v. Ohio, 392 U.S. 1 (1968).

whether the agents' actions were reasonably related in scope to the circumstances initially justifying the detention.  See Lundstrom v. Romero, 616 F.3d 1108, 1120 (10th Cir. 2010).

### 1.  The duration of De La Cruz's detention cannot be justified by the initial suspicion that he was Guel-Rivera

Here, De La Cruz concedes that, at the time the agents initially seized him by surrounding his vehicle, they had reasonable suspicion to believe that he was Guel-Rivera.  That suspicion justified agents detaining De La Cruz briefly in order to verify or dispel their suspicions that he was Guel-Rivera.  See Royer, 460 U.S. at 500.  But any reasonable suspicion that De La Cruz was Guel-Rivera was dispelled when Agent Stanko, who had a picture of Guel-Rivera, returned from apprehending Armando, had a chance to look at De La Cruz, and realized that De La Cruz was not Guel-Rivera.  Guel-Rivera was twenty-eight years old, 5'8", 120 pounds with black eyes, brown hair, and a receding hairline, while De La Cruz was younger, shorter, with no receding hairline, different facial features, and a tattoo on his neck.  These discrepancies, viewed by an objective officer in Agent Stanko's position, dispelled any reasonable suspicion that De La Cruz was Guel-Rivera.[3]

---

[3] See United States v. Alarcon-Gonzalez, 73 F.3d 289, 292-93 (10th Cir. 1996) (holding that reasonable suspicion that one of two roofers was reaching for a gun was dispelled, prior to officers questioning roofers about their immigration status, when it became obvious to officers that the roofer was holding a roofing tool instead of a weapon); United States v. McSwain, 29 F.3d 558, 560-61 (10th Cir. 1994) (holding that reasonable suspicion that vehicle's temporary registration sticker was invalid dissipated once officer approached the vehicle and saw that the temporary registration was valid and had not

Agent Stanko, nevertheless, continued to detain De La Cruz and obtained his identification "just to be safe . . . because I still wasn't a hundred percent sure."[4] (R. v.2 at 18.) The existence of reasonable suspicion, however, is measured from the perspective of an objectively reasonable officer, not from the subjective perspective of the particular officer on scene. See al-Kidd, 131 S. Ct. at 2082; Chavez, 660 F.3d at 1222. Here,

expired); United States v. Millan-Diaz, 975 F.2d 720, 721-22 (10th Cir. 1992) (holding that any reasonable suspicion that vehicle was transporting illegal aliens was dispelled when it became obvious that there were no passengers in the vehicle or in the trunk); see also United States v. Trestyn, 646 F.3d 732, 743-44 (10th Cir. 2011); United States v. Pena-Montes, 589 F.3d 1048, 1050, 1054-55 (10th Cir. 2009); United States v. Edgerton, 438 F.3d 1043, 1044 (10th Cir. 2006); cf. Amundsen v. Jones, 533 F.3d 1192, 1200 (10th Cir. 2008) (holding that driver's conduct during traffic stop did not clearly refute officer's reasonable suspicion that driver was intoxicated).

[4] During the suppression hearing, Agent Stanko testified to the following:

> Q. And at some point during this whole process you conclusively determined that Mr. [De La Cruz] was not Guel-Rivera?
>
> A. Yes, ma'am.
>
> Q. Do you recall when that would have been or what process happened before you believed that to be true?
>
> A. I can say without a doubt upon returning to the scene, at this point, upon seeing [De La Cruz] stand up, I noticed the tattoo on his neck, I noticed his person, the hairline. All of the factors, all of the above, whenever I returned to the scene and was able to get an entire visual of the defendant I had a pretty good idea that he wasn't Guel-Rivera, but just to be safe I went ahead and ran his information anyway because I still wasn't a hundred percent sure.

(R. v.2 at 18.) Agent Stanko testified further that, after seeing De La Cruz standing outside the car, "there were definitely indications" that he was not Guel-Rivera. (Id. at 42.)

7

considering the totality of the circumstances, see Chavez, 660 F.3d at 1221, any reasonable suspicion that Guel-Rivera was the driver would have been dispelled when an objective officer in Agent Stanko's position was able to compare the photo he had of Guel-Rivera with De La Cruz. At that point, any justification for detaining De La Cruz vanished. See Millan-Diaz, 975 F.2d at 722. "'[A]n investigative detention must be temporary and last no longer than is necessary to effectuate' the purpose of either dispelling or confirming the officer's reasonable suspicion." United States v. White, 584 F.3d 935, 953 (10th Cir. 2009) (quoting Royer, 460 U.S at 500). Once reasonable suspicion has been dispelled, "[e]ven a very brief extension of the detention without consent or reasonable suspicion violates the Fourth Amendment."[5] Burleson, 657 F.3d at 1045.

### 2. The duration of De La Cruz's detention cannot be justified by the presence and flight of Armando

An investigative seizure can continue, even after the initial suspicion has dissipated, if "the additional detention is supported by [new] reasonable suspicion of criminal activity. In other words, reasonable suspicion must exist at all stages of the

---

[5] The fact that there was no longer any justification to detain De La Cruz further distinguishes this case from the authority on which the dissent relies, which permits an officer to ask questions and seek identification during "the course of a lawful stop." Dissent at 1, 7. The situation here is also distinguishable from a lawful traffic stop, during which the officer is permitted to determine, among other things, whether the driver has authority to operate the vehicle and a motorist expects to wait a reasonable time while the officer checks the driver's license and vehicle registration. See United States v. Holt, 264 F.3d 1215, 1221 (10th Cir. 2001) (en banc), overruling on other grounds recognized in United States v. Stewart, 473 F.3d 1265, 1269 (10th Cir. 2007).

detention, although it need not be based on the same facts throughout." United States v. Soto-Cervantes, 138 F.3d 1319, 1322 (10th Cir. 1998) (citation omitted). The Government argues that, in this case, the ICE agents acquired new reasonable suspicion to continue to detain De La Cruz, based on Armando's flight and the agents' ensuing discovery that he was in the United States illegally. The Government, however, has failed to meet its burden of demonstrating that the totality of these circumstances established articulable reasonable suspicion to believe that De La Cruz was involved in criminal activity, after the agents realized he was not Guel-Rivera and before De La Cruz gave them a false identification card. See Kitchell, 653 F.3d at 1218-19.

De La Cruz's initial seizure was based solely on the agents' belief that he might be Guel-Rivera. The initial seizure was not predicated on suspicion that De La Cruz, as the driver of the vehicle, was otherwise engaged in criminal activity. For example, the agents did not have reasonable suspicion to believe that De La Cruz, as the driver of the vehicle, had committed any traffic violations that would justify conducting a traffic stop.

Flight can create reasonable suspicion that the person fleeing is involved in criminal activity. See Illinois v. Wardlow, 528 U.S. 119, 121, 124-25 (2000); United States v. Bonner, 363 F.3d 213, 218 (3d Cir. 2004); see also United States v. Cui Qin Zhang, 458 F.3d 1126, 1128 (10th Cir. 2006) (noting flight suggests guilt). But De La Cruz did not flee; only Armando fled.

One could imagine other circumstances where the flight of a passenger might create reasonable suspicion that the driver was also engaged in criminal activity. But this

9

case does not present such circumstances. When the agents apprehended Armando, they discovered he was illegally in the United States. That is a status crime, which would not necessarily suggest that the driver of the vehicle from which he fled was also involved in criminal activity.

One could further imagine other circumstances where the discovery that a fleeing passenger was in the United States illegally might engender reasonable suspicion that the driver and the rest of the vehicle's occupants might also be unlawfully in the country. That might be the case, for example, if the stop occurred close to the U.S.-Mexican border on a highway or road frequently used by illegal immigrants to enter the United States undetected and multiple people fled from a van. But those are not the circumstances presented here.

Based on the Court's inquiry, the Government suggested that an objective officer could have reasonably suspected De La Cruz of unlawfully transporting an illegal alien, in violation of 8 U.S.C. § 1324(a)(1)(A)(ii).[6] But to be unlawful, such transportation must be in furtherance of the alien's violation of the law. See United States v. Franco-Lopez, 687 F.3d 1222, 1226-27 (10th Cir. 2012) (citing United States v. Barajas-Chavez, 162 F.3d 1285, 1287 (10th Cir. 1999) (en banc)). Transportation furthers an alien's violation of the law if it "will help, advance, or promote the alien's illegal entry or continued illegal presence in the United States." Barajas-Chavez, 162 F.3d at 1288.

---

[6] The Court assumes that the Government adequately raised this argument in the district court and on appeal.

Thus, § 1324(a)(1)(A)(ii) proscribes, for example, transportation of an alien by friends or family to enable the illegal alien to find work and/or evade authorities. Barajas-Chavez, 162 F.3d at 1289 n.2. But § 1324(a)(1)(A)(ii) "does not encompass persons who come into daily contact with undocumented aliens and who, with no evil or criminal intent, intermingle with illegal aliens socially and otherwise." Barajas-Chavez, 162 F.3d at 1288 (internal quotation marks, alteration omitted).

The circumstances at issue here, viewed objectively, suggested only that the driver was dropping off Armando to work at the truck wash, just an ordinary social interaction that occurs every day between family, friends and acquaintances. Here, it occurred a significant distance from the U.S. border. Nothing about these circumstances suggested that the driver, by dropping Armando off, apparently at a job he already had, was in any way furthering his unlawful presence in the country.

Even if the agents had reasonable suspicion to believe Gill's Truck Wash employed illegal aliens -- based on information and circumstances suggesting that both Guel-Rivera and Armando were unlawfully in the country and both worked at the truck wash -- such a belief would not justify seizing De La Cruz. See Alarcon-Gonzalez, 73 F.3d at 293 (holding that a reasonable basis for suspecting that "some roofers might be illegal aliens . . . did not give [agents] a reasonable basis for suspecting that [the defendant] in particular might be one of them"). The evidence presented at the suppression hearing suggested only that De La Cruz was dropping off Armando for work at the truck wash, not that De La Cruz himself worked there.

11

An officer may not "legally detain a person simply because criminal activity is afoot. The particular person [who is detained] must be suspected of criminal activity." Romero v. Story, 672 F.3d 880, 887-88 (10th Cir. 2012) (internal quotation marks omitted); see also Pena-Montes, 589 F.3d at 1056; Alarcon-Gonzalez, 73 F.3d at 293. The evidence here, viewed by an objective officer in Agent Stanko's position, indicated only that De La Cruz drove an illegal immigrant to work. Under these circumstances, simply being acquainted with someone who turns out to be in the country illegally does not, without more, create reasonable suspicion that the acquaintance is involved in illegal activity. This court has previously declined to rely on the fact that one member of a group was unlawfully in this country to establish reasonable suspicion to believe that another member of the group was involved in criminal activity. See Soto-Cervantes, 138 F.3d at 1324 (in determining whether officers had reasonable suspicion to believe the defendant was in the United States unlawfully, declining to rely on facts that two other members of a group of four or five men had no identification and one of them admitted to officers that he was in the country illegally; focusing instead on factors that gave officers reasonable suspicion that the defendant himself was involved in criminal activity). Here, too, we reject the general premise that once someone has been identified by authorities as unlawfully in the United States, anyone providing him with transportation for his daily activities is also reasonably suspected of criminal activity. See United States v. Brignoni-Ponce, 422 U.S. 873, 885-87 (1975) (noting that apparent Mexican ancestry of vehicle's occupants, alone, did not provide reasonable suspicion that they were illegal aliens).

12

Each case must rise or fall on the particular facts of that case. Here, the Government has failed to establish that an objective officer would have had reasonable suspicion to believe that De La Cruz was involved in criminal activity, once the agents determined that he was not Guel-Rivera and before De La Cruz provided the agents with a false identification card.

**B. The district court erred in concluding, alternatively, that De La Cruz's identification is not suppressible, even if there was an unlawful seizure**

The district court, alternatively, held that De La Cruz's identity itself is not suppressible, even if there was an unlawful seizure. We cannot affirm the district court's denial of De La Cruz's suppression motion on that basis, either.

The district court based its conclusion on language in Immigration and Naturalization Service v. Lopez-Mendoza, 468 U.S. 1032 (1984). In Lopez-Mendoza, a case addressing civil deportation hearings, the Supreme Court noted that "[t]he 'body' or identity of a defendant or respondent in a criminal or civil proceeding is never itself suppressible as a fruit of an unlawful arrest, even if it is conceded that an unlawful arrest, search, or interrogation occurred." Id. at 1039. Lopez-Mendoza, however, does not "exempt[] from the 'fruits' doctrine all evidence that tends to show a defendant's identity." United States v. Olivares-Rangel, 458 F.3d 1104, 1111 (10th Cir. 2006). Rather, Lopez-Mendoza's "statement that the 'body' or identity of a defendant are 'never suppressible' applies only to cases in which the defendant challenges the jurisdiction of the court over him or her based upon the unconstitutional arrest, not to cases in which the

13

defendant only challenges the admissibility of the identity-related evidence." Olivares-Rangel, 458 F.3d at 1111. The Tenth Circuit interpreted Lopez-Mendoza's language in this manner, analyzing the cases on which Lopez-Mendoza relied and considering Lopez-Mendoza's treatment of the two civil deportation proceedings at issue in that case. See Olivares-Rangel, 458 F.3d at 1111. The Tenth Circuit went on to conclude that

> [s]eeking to suppress one's very identity and body from a criminal proceeding merely because of an unconstitutional arrest is the sort of jurisdictional challenge foreclosed by Lopez-Mendoza. The language in Lopez-Mendoza merely says that the defendant cannot suppress the entire issue of his identity. A defendant may still seek suppression of specific pieces of evidence (such as, say, fingerprints or statements) under the ordinary rules announced in Mapp[ v. Ohio, 367 U.S. 643, 648 (1961) (requiring suppression of any evidence obtained during illegal police conduct)] and Wong Sun[ v. United States, 371 U.S. 471, 485 (1963) (requiring suppression of evidence deemed to be "fruit of the poisonous tree," i.e., discovered as a direct result of unlawful police conduct)]. A broader reading of Lopez-Mendoza would give the police carte blanche powers to engage in any manner of unconstitutional conduct so long as their purpose was limited to establishing a defendant's identity. We do not believe the Supreme Court intended Lopez-Mendoza to be given such a reading.

Id. Thus, the Tenth Circuit concluded

> that the "identity" language in Lopez-Mendoza refers only to jurisdiction over a defendant and it does not apply to evidentiary issues pertaining to the admissibility of evidence obtained as a result of an illegal arrest and challenged in a criminal proceeding. Instead, we utilize the normal and generally applicable Fourth Amendment exclusionary rule to determine whether challenged identity-related evidence should be excluded under the circumstances present in the particular case.

Id. at 1112.

14

Here, De La Cruz never argued that the district court lacked jurisdiction over him. Instead, he sought only to apply "the normal and generally applicable Fourth Amendment exclusionary rule," id., to suppress the identification card he gave the agents and the information the agents learned as a result of that identification card, that De La Cruz was unlawfully in the United States after having been previously deported. Therefore, the district court erred in concluding that De La Cruz's identification was not suppressible, even if there was an unlawful seizure.

## IV. CONCLUSION

For the foregoing reasons, we REVERSE the district court's decision denying De La Cruz's suppression motion and REMAND this case to the district court for proceedings consistent with this decision.

No. 11-5114, United States v. De La Cruz

**BRISCOE**, Chief Judge, dissenting.


I respectfully dissent for two reasons. First, Agent Stanko's request for identification from De La Cruz was supported by reasonable, articulable suspicion based on the evolving events following the initial stop. But more importantly, Agent Stanko did not need independent justification under the Fourth Amendment to request identification. The request was not a "discrete Fourth Amendment event," Muehler v. Mena, 544 U.S. 93, 101 (2005), but a minimal additional intrusion within the course of a lawful stop that did not illegally extend the duration of the stop. Looking to the totality of the circumstances known to Agent Stanko when he asked De La Cruz for his identification, I would affirm the district court's denial of De La Cruz's motion to suppress.

**I**

The proper outcome of this case is dictated by the Supreme Court's decisions in Muehler, 544 U.S. 93, and Hiibel v. Sixth Judicial District Court of Nevada, Humboldt County, 542 U.S. 177 (2004), and our decision in United States v. Alcaraz-Arellano, 441 F.3d 1252 (10th Cir. 2006). The rule from these cases is unmistakable: when an individual is already lawfully detained, an officer is permitted to question the individual—even on matters unrelated to the purpose of the detention—when such questioning does not measurably extend the duration of the detention. The "touchstone" of this analysis is reasonableness, "measured in

objective terms by examining the totality of the circumstances." Ohio v. Robinette, 519 U.S. 33, 39 (1996) (quotation omitted).  And if off-topic questioning is permissible, it is axiomatic that an officer may request identification from an individual when confirming or dispelling suspicion as to the individual's identity is the purpose of the stop.

Agent Stanko's request for identification from De La Cruz was not unrelated to the stop, but rather was at the very heart of the reason for the stop: to determine whether the driver was Guel-Rivera.  This brief interaction did not meaningfully prolong an ongoing, lawful seizure, so no independent reasonable suspicion was required.

**A**

Under Terry's "dual inquiry," we have long examined whether an investigative detention was: (1) "justified at its inception," and (2) "reasonably related in scope to the circumstances which justified the interference in the first place."  Terry v. Ohio, 392 U.S. 1, 20 (1968).  Under the second, or "scope," prong, we have traditionally required that an officer's investigation closely conform to the purpose of the initial stop unless the officer develops additional reasonable suspicion.  See United States v. Jones, 44 F.3d 860, 872 (10th Cir. 1995) (holding that officer must have reasonable suspicion to support questions about narcotics during routine traffic stop); see also Terry, 392 U.S. at 19-20.  But

several years ago, the Supreme Court addressed the long-divisive question[1] of whether Terry's "scope" prong restricts an officer's questioning to matters that relate to the purpose of the initial stop.

In Muehler, a team of SWAT officers executed a search warrant at a residence to look for dangerous weapons and evidence of gang membership. 544 U.S. at 96. The officers knew many of the gang's members were illegal immigrants, so a federal immigration agent accompanied the team. Id. The officers found Iris Mena in a bedroom, placed her in handcuffs, and led her to a converted garage with other occupants. Id. "During their detention in the garage, an officer asked for each detainee's name, date of birth, place of birth, and immigration status. The [immigration] officer later asked the detainees for their immigration documentation." Id.

The Court rejected the Ninth Circuit's conclusion that the officers "were required to have independent reasonable suspicion in order to question Mena concerning her immigration status because the questioning constituted a discrete

---

[1] Compare United States v. Holt, 264 F.3d 1215, 1228 (10th Cir. 2001) (en banc) (per curiam) ("[A]n officer conducting a traffic stop may ask the driver about the presence of loaded weapons in the absence of particularized suspicion of the existence of such firearms."), abrogated as recognized in United States v. Stewart, 473 F.3d 1265, 1269 (10th Cir. 2007); with United States v. Chavez-Valenzuela, 268 F.3d 719, 724 (9th Cir. 2001) ("An officer must . . . restrict the questions he asks during a stop to those that are reasonably related to the justification for the stop."), as amended by 279 F.3d 1062 (2002), abrogated by Muehler, 544 U.S. 93.

Fourth Amendment event." Id. at 100-01. This premise was "faulty" because "mere police questioning does not constitute a seizure." Id. at 101 (quotation and citation omitted). "[E]ven when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual; ask to examine the individual's identification; and request consent to search his or her luggage." Id. (quotation and citation omitted). "Hence, the officers did not need reasonable suspicion to ask Mena for her name, date and place of birth, or immigration status." Id.

This rule gave shape to the Court's prior pronouncement that "[i]n the ordinary course a police officer is free to ask a person for identification without implicating the Fourth Amendment." Hiibel, 542 U.S. at 186; see also INS v. Delgado, 466 U.S. 210, 216 (1984) ("[I]nterrogation relating to one's identity or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure."). Other courts have applied these principles in upholding officer requests for identification from passengers in a vehicle stopped for a traffic violation, even when there is no particularized suspicion that the passengers are violating the law. See United States v. Fernandez, 600 F.3d 56, 60 (1st Cir. 2010) ("The Court repeatedly has held that police requests for identifying information typically do not trigger Fourth Amendment concerns."); Stufflebeam v. Harris, 521 F.3d 884, 888 (8th Cir. 2008) ("[A] police officer does not violate the Fourth Amendment by inquiring into the identity of a vehicle's passenger during the

-4-

course of a lawful traffic stop, even absent reasonable suspicion that the passenger has committed a crime."); United States v. Diaz-Castaneda, 494 F.3d 1146, 1152 (9th Cir. 2007) ("The police may ask people who have legitimately been stopped for identification without conducting a [separate] Fourth Amendment search or seizure."); United States v. Soriano-Jarquin, 492 F.3d 495, 500 (4th Cir. 2007) ("If an officer may 'as a matter of course' and in the interest of personal safety order a passenger physically to exit the vehicle, he may surely take the minimally intrusive step of requesting passenger identification." (citation omitted)). After Muehler, "mere questioning—on any subject—cannot violate the scope prong of Terry." United States v. Everett, 601 F.3d 484, 494 n.10 (6th Cir. 2010).

While a request for identification is minimally intrusive and well within the bounds of Terry, we still must look to the effect of the questioning on the duration of the detention. The Supreme Court has given wide berth to officers in questioning individuals who are lawfully detained, but it is less clear how long an officer can venture down a new path. In general terms, the Court has stated that questioning may not "measurably extend the duration of the stop." See Arizona v. Johnson, 555 U.S. 323, 334 (2009) ("An officer's inquiries into matters unrelated to the justification for the traffic stop, this Court has made plain, do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop.").

We confronted the "prolongation" issue in Alcaraz-Arellano. 441 F.3d

1252. There, an officer stopped the defendant for speeding but asked him questions that were unrelated to the purpose of the stop. Id. at 1258-59. Applying Muehler, we held that "the questioning, regardless of the topic, did not violate the Fourth Amendment" because it "did not prolong the detention." Id. at 1259. In looking to the duration, we refused to adopt a bright-line rule; instead, we looked to the totality of the circumstances to determine whether the stop was "appreciably" prolonged. Id. at 1258-59. Rather than "make a time and motion study of traffic stops," we "consider the detention as a whole and the touchstone of our inquiry is reasonableness." United States v. Patterson, 472 F.3d 767, 776 (10th Cir. 2006), vacated on other grounds, 555 U.S. 1131 (2009).

Similarly, other courts have held that an officer is entitled to ask questions unrelated to the initial purpose of the stop so long as those questions do not "unreasonably extend" the detention. United States v. Martin, 422 F.3d 597, 601-02 (7th Cir. 2005) ("A traffic stop does not become unreasonable merely because the officer asks questions unrelated to the initial purpose for the stop, provided that those questions do not unreasonably extend the amount of time that the subject is delayed."); see also United States v. Digiovanni, 650 F.3d 498, 507 (4th Cir. 2011) ("[W]here a delay [attributed to off-topic questioning] can be characterized as de minimis under the totality of the circumstances, it will not be recognized as a Fourth Amendment violation."); Everett, 601 F.3d at 494 (holding that "the proper inquiry is whether the 'totality of the circumstances surrounding

-6-

the stop' indicates that the duration of the stop as a whole—including any prolongation due to suspicionless unrelated questioning—was reasonable").

In light of these cases, it is clear that officers may engage in questioning on any subject that has a de minimis effect on the duration of the traffic stop. Alcaraz-Arellano, 441 F.3d at 1259. Of all possible topics, this rule manifestly permits questions related to an individual's identity, which "are a routine and accepted part of many Terry stops." Hiibel, 542 U.S. at 186.

**B**

These principles lead me to conclude that Agent Stanko's request for identification was not a "discrete Fourth Amendment event" requiring reasonable suspicion. Muehler, 544 U.S. at 101. Rather, it was a minimal additional intrusion within the course of a lawful stop.

At the outset, it is necessary to determine whether the stop was ongoing when Agent Stanko questioned De La Cruz about his identity. If the stop had reached its logical conclusion when Agent Stanko questioned De La Cruz, he would have needed reasonable suspicion to justify any continued interaction. See United States v. McSwain, 29 F.3d 558, 561 (10th Cir. 1994) (holding that once "the purpose of the stop was satisfied," an officer's continued detention of the driver "exceeded the scope of the stop's underlying justification"). "Normally, the stop ends when the police have no further need to control the scene, and inform the driver and passengers they are free to leave." Johnson, 555 U.S. at 333.

By the time Agent Stanko returned to a handcuffed De La Cruz,[2] the nature and scope of the initial stop had changed considerably. He and another agent had just chased down a passenger who fled upon seeing them approach. The agents had determined that the passenger was an illegal alien, but they had no way of knowing <u>why</u> he ran away. Were there guns, drugs, or a dead body in the car? Stolen items from a recent robbery? Or was he simply trying to avoid deportation? We cannot expect the reasonable law enforcement officer in this situation to disengage completely from the events that he had just witnessed and permit the vehicle's other occupants to go on their way, leaving these questions unanswered. In light of the developments, these agents had a continuing "need to control the scene" when they returned to the vehicle. <u>See</u> <u>id.</u> Thus, Agent Stanko questioned De La Cruz as part of an ongoing, lawful seizure.

In light of <u>Muehler</u> and <u>Alcaraz-Arellano</u>, we must determine only whether the questions appreciably lengthened the duration of the stop; the content of the

---

[2] There is disagreement as to whether De La Cruz was still handcuffed when Agent Stanko asked him for identification. Agent Stanko testified that he did not handcuff De La Cruz before pursuing the passenger. ROA, Vol. II at 17. Agent Newman testified that he handcuffed De La Cruz as soon as the passenger ran away. <u>Id.</u> at 58-59. He did not remember whether De La Cruz was still in handcuffs when Stanko returned and asked him for identification. <u>Id.</u> at 59. De La Cruz argues that the resolution of this dispute is not pertinent to his case because he was detained either way. <u>Id.</u> at 66. Indeed, Newman instructed him not to move and the ICE vehicle's emergency lights were activated.

questions is irrelevant.[3] Viewed in the light most favorable to the government, the record indicates Agent Stanko questioned De La Cruz "almost immediately after returning to the scene" for "a minute or two." ROA, Vol. II at 15. This questioning did not subject De La Cruz to a significant additional intrusion. Given the totality of the circumstances, the identification check did not "measurably extend the duration of the stop." Johnson, 555 U.S. at 334.

## II

In the alternative, even assuming Agent Stanko needed reasonable, articulable suspicion that De La Cruz was engaged in criminal activity to question him about his identity, that requirement is satisfied.

Again, we must consider the totality of the circumstances confronting the officer, and we must do so in the light most favorable to the government. First, Agent Stanko's quick glimpse of De La Cruz as he drove into the parking lot led him to believe that he had found Guel-Rivera, the targeted alien. But when he returned from the foot chase, he had "a pretty good idea" he had been mistaken. ROA, Vol. II at 18. His testimony reveals lingering concern about these perceptions. He testified:

---

[3] That said, Agent Stanko's questioning was eminently reasonable "based on the inherent dangers of the motor vehicle stop and [his] need to orient himself to who and what he may be dealing with." United States v. Chaney, 584 F.3d 20, 27 (1st Cir. 2009). And again, ascertaining the identity of a lawfully detained individual is a "routine and accepted part of many Terry stops." Hiibel, 542 U.S. at 186.

> I can say without a doubt upon returning to the scene, at this point, upon seeing Rivera stand up, I noticed the tattoo on his neck, I noticed his person, the hairline. All of the factors, all the above, whenever I returned to the scene and was able to get an entire visual of the defendant <u>I had a pretty good idea that he wasn't Guel-Rivera</u>, but just to be safe I went ahead and ran his information anyway because <u>I still wasn't a hundred percent sure</u>.

<u>Id.</u> (emphasis added). On cross-examination, Agent Stanko reiterated: "As I'm standing there beside him shortly after I approached the vehicle . . . I have yet to conclusively dispose of my suspicions, my observations that I had observed as he entered the lot." <u>Id.</u> at 39. This testimony suggests he was still unsure about the driver's identity after he returned from chasing the fleeing passenger. De La Cruz's resemblance of Guel-Rivera was the predicate for the initial stop, and it had not dissipated by the time Agent Stanko requested identification.

Second, while not dispositive, the passenger's flight was a further fact that only strengthened the agent's belief that De La Cruz was, in fact, the targeted alien. Agent Stanko's first close look at De La Cruz came just after he returned from a hot pursuit of the passenger, who turned out to be an illegal alien. Of course, as the majority points out, it would be unreasonable to conclude that De La Cruz is present in the United States illegally simply by virtue of his "mere propinquity" to an illegal alien. <u>See</u> <u>Ybarra v. Illinois</u>, 444 U.S. 85, 91 (1979). But this development does not stand alone, and it must carry some force in the reasonable suspicion analysis. Given the circumstances, we cannot expect a

-10-

trained immigration agent to completely dismiss the fact of a passenger's flight when considering the possibility that other occupants of the vehicle may be engaged in criminal activity.[4]

Third, the agents knew Gill's Truck Wash employed illegal aliens, including Guel-Rivera. As the stop occurred before the business was open, a reasonable agent could have concluded that one or more of the occupants in the car were truck wash employees or were engaged in harboring aliens.

Taken together, these facts support a request for identification to "verify or dispel the officer's suspicion in a short period of time." Florida v. Royer, 460 U.S. 491, 500 (1983) (plurality opinion). Further, when Agent Stanko's testimony is viewed in the proper light, he had yet to dispel his suspicions when he questioned De La Cruz about his identity. His request for De La Cruz's identification was supported by reasonable suspicion.

## III

I would affirm the order of the district court denying De La Cruz's motion to suppress.

---

[4] At the suppression hearing, the government suggested that continued detention was proper because De La Cruz presumably knew that his passenger was in the country illegally. ROA, Vol. II at 68-69. But the government struggled to identify a relevant federal offense; it grappled with the idea that harboring an illegal alien could be a crime before ultimately dropping the argument. See id.

-11-